The CITY OF BISMARCK, Plaintiff and Appellee,

v.

Gabriel NASSIF, Defendant and Appellant.

Cr. No. 890044.

Supreme Court of North Dakota.

Dec. 20, 1989.

Michael Ray Hoffman (argued), Bismarck, for defendant and appellant.

Paul H. Fraase (argued), Asst. City Atty., Bismarck, for plaintiff and appellee.

ERICKSTAD, Chief Justice.

Gabriel Nassif was charged in municipal court with the offense of disorderly conduct in violation of City of Bismarck Ordinance 6-05-01. He requested a jury trial in county court. On January 20, 1989, Nassif was convicted of the offense by a jury in Burleigh County Court. He was sentenced to seven days, suspended for one year, subject to the condition that he have no further criminal violations, and fined $300, with $150 of the fine being suspended. He has appealed to this Court. We affirm in part, reverse in part, and remand for further proceedings.

On the morning of April 10, 1988, Nassif reported to the Bismarck police that his car had been vandalized. Later that evening, at approximately 6:10 p.m., Nassif telephoned the Bismarck Police Department on 911 in relation to the same incident. As a result of the telephone call, Officers Houghton, Anderberg, and Blazek were sent to Nassif's residence. The officers were informed that Nassif was upset that the police were not doing anything about his complaint, that he had threatened to take the law into his own hands, and that he had a gun.

When the officers arrived at Nassif's residence, Nassif was still in telephone contact with Lieutenant Ringuette of the Bismarck Police Department. Lieutenant Ringuette told Nassif to go outside to talk to the police officers. Nassif testified that he looked out his back window and saw three officers, two with guns drawn.

Nassif exited his house, whereupon he confronted the police officers. Officers Houghton and Anderberg testified that Nassif was upset, shouting, loud, and aggressive. Officer Blazek testified that the longer they talked to Nassif the more agitated he became. Officer Houghton told Nassif that if there was nothing they could do for him, they were going to leave. At this point, several people had gathered around Nassif's home.

Finally, Officer Houghton said that they would be leaving. He testified that Nassif then said "you fucking son of a bitch, I'm going to go back into the house and get my shotgun and blow you bastards away." Officer Anderberg then grabbed Nassif, handcuffed him, and placed him under arrest for disorderly conduct. Officers Houghton and Anderberg testified that they felt threatened and were concerned for their safety.

By amended complaint, Nassif was charged with disorderly conduct in violation of Bismarck City Ordinance 6-05-01. The complaint charged that on April 10, 1988:

"the said defendant did willfully and unlawfully with intent to harass, annoy or alarm another person or in reckless disregard of the fact that another person is harassed, annoyed or alarmed by his behavior in public place used abusive or obscene language or made obscene ges-

ture, which language or gesture by its very utterance or gesture inflicts injury or tends to incite immediate breach of peace, to-wit: Used offensive and obscene language and threatened to do bodily harm to officers, or—in the alternative, engaged in fighting, violent tumultuous or threatening behavior, to-wit: Indicated to police officers that he had a gun and was going inside to get it to blow them away."

On January 20, 1989, a jury of six found Nassif guilty. On appeal, Nassif raises the following issues:

## I.

"IS CITY OF BISMARCK ORDINANCE § 6-05-01(1) AND (3) UNCONSTITUTIONALLY OVERBROAD AND VAGUE ON ITS FACE IN THAT IT INFRINGES ON THE RIGHT OF FREE SPEECH PROTECTED BY THE FIRST AMENDMENT?"

## II.

"IS THE EVIDENCE INSUFFICIENT IN THAT THE LANGUAGE USED BY DEFENDANT DID NOT CONSTITUTE 'FIGHTING WORDS'?"

## III.

"IS THE EVIDENCE INSUFFICIENT TO SHOW THAT DEFENDANT USED THE LANGUAGE IN A PUBLIC PLACE?"

## IV.

"DID THE THE TRIAL COURT ERR BY FAILING TO GIVE DEFENDANT'S REQUESTED JURY INSTRUCTION ON ENTRAPMENT?"

## V.

"DID THE TRIAL COURT ERR BY NOT INQUIRING INTO DEFENDANT'S WAIVER OF HIS DEFENSE OF LACK OF CRIMINAL RESPONSIBILITY TO DETERMINE WHETHER IT WAS COMPETENTLY, INTELLI-

GENTLY AND VOLUNTARILY MADE?"

## I.

### CONSTITUTIONALITY

Nassif was charged, in the alternative, with subsections 1 and 3 of Bismarck City Ordinance 6-05-01. Those subsections read as follows:

"6-05-01. *Disorderly Conduct.* A person is guilty of an offense if, with intent to harass, annoy, or alarm another person or in reckless disregard of the fact that another person is harassed, annoyed, or alarmed by his behavior, that person:

1. Engages in fighting, or in violent, tumultuous or threatening behavior;

\* \* \* \* \* \*

3. In a public place, uses abusive or obscene language, or makes an obscene gesture, which language or gesture by its very utterance or gesture inflicts injury or tends to incite an immediate breach of the peace."

On appeal, Nassif asserts that subsection 1 of the ordinance is susceptible of application to constitutionally protected speech, and thus overbroad and unconstitutional. Before this Court will address an issue on appeal, even a constitutional issue, that issue must have been sufficiently raised in the court below. *See City of Grand Forks v. Cameron,* 435 N.W.2d 700 (N.D.1989). During oral argument, Nassif's counsel contended that the constitutionality of section 1 of the ordinance was properly raised by Nassif's trial counsel during a discussion in chambers. The colloquy follows:

"MR. HIGGINS: I would make a further motion for judgment of acquittal on the charge as relates to the language on the grounds that the Statute is overbroad and trespasses on the First Amendment, the right of free expression. The language of the State Statute is vague. It talks about, as I recall, abusive language. No indications to its specific abuse which annoys someone.

"MR. FRAASE: The City would reject, or oppose the motion. We are talking about obscene and abusive. Perhaps some people have difficulty with the term obscene, but I doubt that anyone would have a problem with what abusive means. And the officers communicated that they were annoyed and alarmed by the tone of the language, the context of the language, and the concern or threat that was implied to them through the use of the context.

"THE COURT: The motion is denied." As that colloquy relates only to subsection 3 of the ordinance, the facial validity of subsection 1 of the ordinance was not raised in the trial court, and, accordingly, we will not address it. An issue not raised in the trial court is generally not reviewable by this Court unless the issue constitutes "obvious error" under Rule 52(b), N.D.R.Crim.P. *State v. Raywalt*, 436 N.W.2d 234, 239 (N.D.1989); *Cameron, supra* at 702; *State v. Kopp*, 419 N.W.2d 169 (N.D.1988).

■ As to the constitutionality of subsection 3 of the ordinance, Nassif concedes that the language "tends to incite an immediate breach of the peace" limits that subsection's application to "fighting words," which are not constitutionally protected. *See Chaplinsky v. New Hampshire*, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942) (category of speech that has been held unprotected by the First Amendment is that of "fighting words," which have been defined as those words that "tend to incite an immediate breach of the peace.")

Nassif contends, however, that subsection 3 is in conflict with state law and thus

invalid. Nassif bases this assertion on the fact that the state statute prohibiting disorderly conduct, section 12.1–31–01(3), N.D. C.C.,[1] does not contain sufficient protective language. Nassif argues:

"The question is then, 'Does the ordinance supersede state law?' If so, then the language is invalid and the offense is to be construed to be consistent with the definition of that offense set forth in state law. City of Bismarck ordinance § 6–01–2.... See also N.D.C.C. § 12.1–01–05. The ordinance appears to be in conflict with the state statute because it prohibits conduct different than that which is prohibited by the state statute. See *City of Grand Forks v. Cameron*, 435 N.W.2d 700 (N.D.1989). And without the limiting language, the ordinance which attempts to prohibit abusive or obscene language generally suffers from the same disability as the state statute—it is overbroad in that it is susceptible of application to protected speech."

■ Section 12.1–01–05, N.D.C.C.,[2] provides that a city ordinance may not supersede an offense defined by state law. *City of Grand Forks v. Cameron, supra* at 702. Bismarck City Ordinance section 6–01–02 also provides that "the language in conflict with or contrary to state law shall be invalid and the offense containing such language shall be construed to be consistent with the definition of that offense set forth in state law." Thus, the question is whether or not the city ordinance with language different from the state statute, which language immunizes it from unconstitutional virus, because of that variance in language,

1. Section 12.1–31–01(3), N.D.C.C., reads as follows:

"*Disorderly conduct.* A person is guilty of a class B misdemeanor if, with intent to harass, annoy, or alarm another person or in reckless disregard of the fact that another person is harassed, annoyed, or alarmed by his behavior, he:

\*  \*  \*  \*  \*  \*

"3. In a public place, uses abusive or obscene language, or makes an obscene gesture."

2. Section 12.1–01–05, N.D.C.C., reads:

"*Crimes defined by state law shall not be superseded by city or county ordinance or by home rule city's or county's charter or ordinance.* No offense defined in this title or elsewhere by law shall be superseded by any city or county ordinance, or city or county home rule charter, or by an ordinance adopted pursuant to such a charter, and all such offense definitions shall have full force and effect within the territorial limits and other jurisdiction of home rule cities or counties. This section shall not preclude any city or county from enacting any ordinance containing penal language when otherwise authorized to do so by law."

must be considered to have superseded the statute. We think not, as a state statute must be construed whenever possible to be constitutional. We construe the state statute to prohibit the same offense and limit it to that offense. *Tang v. Ping*, 209 N.W.2d 624 (N.D.1973). In *Tang* we said:

> "Courts will construe statutes so as to harmonize their provisions with the Constitution if it is possible to do so, to the end that they may be sustained." Syllabus paragraph 2, *Tang v. Ping*, 209 N.W.2d 624 (N.D.1973).

We have recently dealt with such an issue in *City of Grand Forks v. Cameron, supra.* In *Cameron*, the defendant was convicted of violating section 9–0205 of the Grand Forks City Code, which reads:

> " 'Every person who willfully delays or obstructs a public officer in the discharge or attempt to discharge any duty of his office, shall upon conviction thereof, be punished as herein provided.' "

The state statute on physical obstruction is section 12.1–08–01, N.D.C.C. That section, in relevant part, reads:

> *"Physical obstruction of government function.*
>
> "1. A person is guilty of a class A misdemeanor if he intentionally obstructs, impairs, impedes, hinders, prevents, or perverts the administration of law or other governmental function."

In determining whether or not the city ordinance superseded the state statute, we said:

> "We have recently observed that '[t]he legislature's intent to have uniformity in criminal law throughout the state is clearly expressed in section 12.1–01–05, N.D.C.C.' Because the City has not indicated an intention to prohibit in § 9–0205 any conduct other than that prohibited by the state statute, we construe § 9–0205 of the Grand Forks City Code as reaching only physical obstruction, in accordance with § 12.1–08–01, N.D.C.C." [Cites omitted.]

*Cameron* at 702.

Subsection 3 of Bismarck City Ordinance 6–05–01 does not attempt to prohibit or penalize any speech other than that which is constitutionally prohibited by the state statute. The additional language of the ordinance only clarifies the particular language which it prohibits. It literally expresses what the state statute must be construed to include to be constitutional.

■ Accordingly, we conclude that the ordinance has not superseded the state statute and that as the ordinance stands in its entirety, it is not facially susceptible of application to constitutionally protected speech. It is therefore not unconstitutional.

## II.

## SUFFICIENCY OF EVIDENCE

■ Nassif contends that the evidence was insufficient to show that his words, by their very utterance, inflicted injury or tended to incite an immediate breach of the peace. In challenging the sufficiency of the evidence, Nassif must show that the evidence, when viewed in the light most favorable to the verdict, reveals no reasonable inference of guilt. *Cameron, supra* at 702; *State v. Lawenstein*, 346 N.W.2d 292, 293 (N.D.1984).

Nassif contends that the fact that the officers may have been annoyed or offended by his conduct does not prove that his words amounted to "fighting words." He also contends that there was no evidence that his words had any effect on the bystanders.

■ One of the categories of speech that has been held unprotected by the First Amendment is that of "fighting words." *See Chaplinsky v. New Hampshire, supra*, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031. "Fighting words" have been defined as " 'those personally abusive epithets which, when addressed to the ordinary citizen, are, as a matter of common knowledge, inherently likely to provoke violent reaction,' " *Cohen v. California*, 403 U.S. 15, 20, 91 S.Ct. 1780, 1785, 29 L.Ed.2d 284, 291 (1971), or those words that " 'tend to incite an immediate breach of the peace.' " *Chaplinsky*, 315 U.S. at 572, 62 S.Ct. at 769, 86 L.Ed. at 1035. We believe that

Nassif's shouting "you fucking son of a bitch, I'm going to go back into the house and get my shotgun and blow you bastards away," along with the circumstances, constituted language which falls within the meaning of "fighting words."

Nassif makes issue of the fact that the language was addressed to police officers. Justice Powell suggested in a concurrence to *Lewis v. City of New Orleans*, 415 U.S. 130, 135, 94 S.Ct. 970, 973, 39 L.Ed.2d 214, 220 (1974), that "a properly trained officer may reasonably be expected to 'exercise a higher degree of restraint' than the average citizen, and thus be less likely to respond belligerently to 'fighting words.'" In an earlier case, but still good law, the United States Supreme Court, speaking through Justice Douglas said:

> "[T]he First Amendment protects a significant amount of verbal criticism and challenge directed at police officers. 'Speech is often provocative and challenging.... [But it] is nevertheless protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest.' *Terminiello v. Chicago*, 337 U.S. 1, 4 [69 S.Ct. 894, 896, 93 L.Ed. 1131] (1949)."

*Houston v. Hill*, 482 U.S. 451, 461, 107 S.Ct. 2502, 2509, 96 L.Ed.2d 398, 412 (1987).

■ We believe that a jury consisting of reasonable people could have reasonably concluded that the threat of Nassif to get his shotgun and "blow you bastards away" was sufficient to produce a clear and present danger of a serious substantive evil that arose far above public inconvenience, annoyance, or unrest, especially in light of the testimony of the effect of those words upon the officers. Therefore, we conclude that the evidence, when viewed in the light most favorable to the verdict, reveals that Nassif's language constituted "fighting words."

### III.

### PUBLIC PLACE

■ Subsection 3 of the ordinance under which Nassif was convicted, requires that the offense occur in a public place. Nassif contends that as he was on his own property at all times and as the officers were on his private property when the incident occurred, that this event did not occur in a public place. This Court has not addressed the issue of what constitutes a public place in the context of "fighting words."

We think an Iowa Supreme Court case which dealt with the issue of what constitutes a public place in the context of a charge of "disturbance of the public peace and quiet" is pertinent. *See State v. Leonard*, 255 Iowa 1365, 124 N.W.2d 429 (1963). In *Leonard*, the defendant, from his home, called a city clerk over the telephone. The call was received in the clerk's private office. In determining whether or not the offense was done in a public place, the court said:

> "The fact that the phone call originated in the defendant's home is unimportant. The offense is determined by the public or private nature of the place where the call is received or the words heard....
>
> "We need not decide whether the clerk's private office was a public place under these facts, for the evidence is that defendant spoke so loudly that a witness working in the main office, which is without question open to the public, overheard the conversation and the obscene words of the defendant."

*Leonard*, 124 N.W.2d at 433.

In the case at bar, there was testimony from the officers that approximately 20 to 25 people had gathered around the area of the incident. Officer Houghton testified that some people were as close as 75 feet away. Officer Anderberg testified that Nassif was talking extremely loud when he shouted the threats at the police officers. Officer Anderberg testified that he was about 40 feet from Nassif and could hear him at all times. Officer Blazek testified that he was standing in a parking lot just north of Nassif's property when Nassif threatened the officers, and that he could hear Nassif.

When the evidence is viewed in the light most favorable to the verdict, even though

there is no direct testimony that any of the bystanders who were on public property heard Nassif, the jury could reasonably have concluded that the bystanders did hear him and thus that the incident occurred in a public place.

## IV.

### ENTRAPMENT

Nassif contends that it was error for the trial court not to give his requested instruction on entrapment. He contends that he was entrapped by the police in that the police knew that he was in an emotional state, the officers were not responsive to his inquiries, and thus, the officers provoked him into a higher state of agitation.

■ Entrapment occurs "when a law enforcement agent induces the commission of an offense, using persuasion or other means likely to cause normally law-abiding persons to commit the offense. Conduct merely affording a person an opportunity to commit an offense does not constitute entrapment." Section 12.1–05–11, N.D. C.C. The defendant has the burden of proving, by a preponderance of evidence, the affirmative defense of entrapment. *City of Mandan v. Willman*, 439 N.W.2d 92, 93 (N.D.1989); *State v. Weisz*, 356 N.W.2d 462, 464 (N.D.1984); *State v. Kluck*, 340 N.W.2d 446, 447 (N.D.1983).

■ A defendant is entitled to an instruction based on a legal defense if there is evidence to support it. *City of Mandan v. Willman, supra; State v. Michlitsch*, 438 N.W.2d 175 (N.D.1989); *State v. Thiel*, 411 N.W.2d 66 (N.D.1987). If no dispute exists over the facts or the inferences to be drawn from the facts, the Court may determine the existence of entrapment as a matter of law. *State v. Rehling*, 426 N.W.2d 6, 7 (N.D.1988). In determining whether or not the jury should have been instructed on a particular defense, we view the evidence in a light most favorable to the defendant. *City of Mandan v. Willman, supra* at 93.

The evidence, considered in a light most favorable to Nassif, reveals that after Nassif called 911, the officers reported to his residence. The officers had been informed that Nassif was upset, that he was threatening to take the law into his own hands, and that he had a gun. Nassif was upset that three officers responded instead of only one and he observed two officers with their guns drawn. After exiting his house, Nassif asked the officers what they were doing. Officer Blazek testified that they responded to the effect that they were called to his residence, and asked him what the problem was. Nassif then became agitated and started shouting at and threatening the officers. At one point, Nassif asked the officers for their names and badge numbers. There is conflicting testimony as to whether or not the officers gave Nassif this information.

■ The trial court refused to give the entrapment instruction, reasoning that it was not an appropriate defense. A trial court may properly refuse to submit any inapplicable or irrelevant instruction to the jury. *City of Mandan v. Willman, supra* at 94; *State v. Biby*, 366 N.W.2d 460, 465 (N.D.1985). There is no evidence to indicate that the officers induced the commission of the offense. The fact that three officers arrived at the scene and that the officers may not have given Nassif their names or badge numbers is not the type of conduct which would cause "normally law-abiding persons to commit the offense." We conclude upon review of the facts that the trial court did not err in refusing to instruct the jury on entrapment.

## V.

### CRIMINAL RESPONSIBILITY

Nassif's trial attorney filed a Notice of Defense of Lack of Criminal Responsibility on September 8, 1988.[3] The City requested, and the trial court ordered, Nassif to submit to a mental health examination at the North Dakota State Hospital. Nassif himself, then indicated through a letter to the trial court that he did not wish to use

---

3. Nassif's attorney at the time of the trial was Kent A. Higgins.

this defense. This was apparently done against the advice of his attorney. His attorney then made a motion to withdraw as counsel, which was denied by the trial court. Formal withdrawal, signed by both Nassif and his attorney, of the defense of lack of criminal responsibility was made to the trial court on January 18, 1989. This was two days before the trial which commenced on January 20, 1989.

Nassif contends that the trial court erred by not inquiring into his waiver of the defense of lack of criminal responsibility to determine whether or not it was competently, intelligently, and voluntarily made.

It is not unusual for a defendant and counsel to have a disagreement as to some matter connected with a criminal trial. It is clear that there are some decisions that a competent defendant is entitled to make, regardless of the views of counsel, if the defendant makes them knowingly and voluntarily. See *Rock v. Arkansas,* 483 U.S. 44, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987) (defendant has right to decide whether or not to testify on one's own behalf); *Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) (defendant who intelligently and voluntarily chooses to represent himself cannot be compelled to be represented by counsel); *Brookhart v. Janis,* 384 U.S. 1, 86 S.Ct. 1245, 16 L.Ed.2d 314 (1966) (defendant has constitutional right to decide whether or not to plead guilty). These cases indicate that the defendant ordinarily has the ultimate decision when the issue at hand involves a choice that will inevitably have important personal consequences for him or her, and when the choice is one a competent defendant is capable of making.

We think it significant also that we recently held *In Interest of R.Z.,* 415 N.W.2d 486 (N.D.1987), that the trial court must determine competence of respondent to make knowing and intelligent waiver of right to counsel before permitting respondent to proceed pro se in an involuntary commitment proceeding.

Several jurisdictions have dealt with the issue of who should make the determination as to whether or not a defendant will use the defense of lack of criminal responsibility due to insanity.

In *Frendak v. United States,* 408 A.2d 364 (D.C.1979), a trial court, over defendant's objection, interposed an insanity defense after a jury had found the defendant guilty of first degree murder. The defendant, on appeal, argued that the trial judge erred in forcing the insanity defense upon him. The District of Columbia Court of Appeals held that "the trial judge may not force an insanity defense on a defendant found competent to stand trial if the individual intelligently and voluntarily decides to forego that defense." *Frendak* at 367. The Court also said that the trial judge must make further inquiry into whether or not the defendant has made an intelligent and voluntary waiver of that defense. The Court determined that it was unclear, in that case, whether or not the defendant had made an intelligent and voluntary waiver and thus the Court remanded the case for further proceedings.

In *Treece v. State,* 313 Md. 665, 547 A.2d 1054 (1988), the issue was whether a criminal defendant or the defendant's counsel is entitled to decide to defend on the basis of a plea of not criminally responsible by reason of insanity. The Court of Appeals of Maryland held that a defendant who is competent is entitled to decide whether or not the defense of criminal responsibility is to be interposed at that trial. The Court discussed the situation in which there is a disagreement between a client and counsel on the point of raising such defense. The Court stated that the decision is one for the defendant to make, but that the judge must be sure that the defendant's decision is intelligent and voluntary. The Court of Appeals concluded that the first step in that analysis is to decide the defendant's competence to stand trial if competence is at issue, and that the next step is to ascertain that the defendant's decision not to plead not criminally responsible is intelligent and voluntary. It went on to say that the defendant must be made aware of available alternatives and of the advantages and disadvantages of one choice as compared to another. The Court of Appeals of Maryland reversed and remanded

the case holding that the trial court was wrong in holding that the pleading decision was for counsel and not client to make.

In *People v. Gettings*, 175 Ill.App.3d 920, 125 Ill.Dec. 489, 530 N.E.2d 647 (4 Dist. 1988), the defendant was convicted of aggravated battery and armed violence. He contended on appeal that the trial court erred in accepting his waiver of the insanity defense without inquiring as to whether or not his waiver was intelligent and voluntary. On the day of defendant's trial, defendant's counsel advised the court in chambers that he had spoken with the defendant at great length about the defense of insanity or diminished capacity and a possible plea of guilty but mentally ill. With regard to all, defendant had emphatically instructed his counsel not to pursue them. The court accepted the waiver and proceeded with the trial without further discussion of the matter. The issue as stated by the appellate court was "when the court is advised by defendant's counsel that a competent defendant had decided to waive a viable insanity defense, over defense counsel's objection, must the court ascertain whether the waiver is voluntary and intelligent before it is accepted or can the trial judge simply accept the waiver without conducting an inquiry with the defendant?" *Gettings* at 649. Relying on *Frendak, supra,* the Illinois Appellate Court ruled that an inquiry is required. The Court went on to set out what such an inquiry should include. All that may be necessary is a short discussion between the judge and the defendant, addressing such issues as: whether or not the defendant has been advised of the availability of the defense; what reason the defendant has for waiving the defense; whether or not the defendant understands the consequences of waiving an insanity defense; and, whether or not defendant understands the consequences of a successful insanity defense. The Court held:

> "As to defendant's first issue, we agree the record does not show that defendant did knowingly and intelligently

waive the insanity defense. Therefore, we vacate the judgment and remand this case for the court to conduct an inquiry with the defendant. If the court determines that the defendant's waiver was knowing and intelligent, then the court shall reenter the judgment of conviction of armed violence and resentence the defendant. If the court determines that the waiver was not knowing and intelligent, then the court shall conduct a new trial for the defendant."

*Gettings* at 651.

■ We are persuaded by these cases that in order to determine whether or not a defendant has competently, intelligently, and voluntarily waived the defense of lack of criminal responsibility, the trial court must make some type of inquiry of the defendant. We agree with the Illinois Appellate Court in *Gettings* as to the type of inquiry which should be made. Once a trial court is convinced that a defendant has competently, intelligently, and voluntarily waived the defense, the court may then accept the decision of the defendant to waive the defense.[4]

Our record does not show whether or not the defendant did competently, intelligently, and voluntarily waive the defense of lack of criminal responsibility. The judgment of conviction is therefore reversed.

In summary, we affirm the trial court on issues I, II, III, and IV, but reverse the judgment of conviction on the basis of issue V and remand for further proceedings consistent with this opinion.

GIERKE, LEVINE and MESCHKE, JJ., and VERNON R. PEDERSON, Surrogate Justice, concur.

VERNON R. PEDERSON, Surrogate Justice, sitting in place of VANDE WALLE, J., disqualified.

---

4. Nassif apparently, against advice of his counsel, wrote a letter to the trial court dated September 24, 1988. We do not believe this letter indicated that he fully understood the consequences of his waiver of the defense of lack of criminal responsibility for his actions and words.