2005 VT 104

## State of Vermont v. Theodore L. Brown

[890 A.2d 79]

No. 03-384

Present: Reiber, C.J., Dooley, Johnson and Skoglund, JJ., and Allen, C.J. (Ret.), Specially Assigned

Opinion Filed August 26, 2005

*William H. Sorrell*, Attorney General, and *David Tartter*, Assistant Attorney General, Montpelier, for Plaintiff-Appellee.

*Matthew F. Valerio*, Defender General, and *Anna Saxman*, Deputy Defender General, Montpelier, for Defendant-Appellant.

*Richard Verrochi*, Pro Se, Amherst, New Hampshire, for Amicus Curiae Amherst Bail Bonds, Inc.

¶ 1. **Dooley, J.** Defendant appeals jury convictions of attempting to elude, reckless endangerment, and grossly negligent operation. He also appeals an order forfeiting his $5000 bail. On appeal, defendant argues that (1) bail forfeiture was erroneous because his appearance was not required and his absence was excusable because he was in federal custody; (2) he did not knowingly, voluntarily, and intelligently waive his right to counsel; (3) the trial court erred in preventing him from reasserting a defense of insanity; and (4) the trial court erred in instructing the jury that aiming was not an essential element of the reckless endangerment offense. We vacate the trial court's order forfeiting bail. We affirm defendant's waiver of counsel; however, we

find that the trial court erred in denying defendant an opportunity to reinstate his insanity defense and in instructing the jury on the reckless endangerment charge. Therefore, we reverse defendant's convictions and remand for a new trial.

¶ 2. The basic facts surrounding defendant's arrest and conviction are set out below. Additional facts are included in the analysis of the relevant issues. On November 4, 2002, Vermont State Police Officer Paul Gauthier, while watching traffic on Interstate 91, observed defendant's car traveling in excess of ninety miles per hour and directed the vehicle to stop. Defendant did not pull over; instead he sped up, eventually exiting the highway and leading police on a chase through Windsor County. Officer Gauthier followed defendant off the highway and onto smaller, eventually dirt, roads with his lights and siren activated. During the chase, Officer Gauthier lost sight of the vehicle. Over the radio Officer Gauthier heard that defendant had been sighted and then saw defendant's car approaching his stopped cruiser. Defendant's car swerved towards the cruiser, but no collision occurred. Eventually, police blockaded defendant's car and forced him to stop. Defendant was initially charged with attempting to elude and grossly negligent operation. Later, the prosecution amended the information and added a count of reckless endangerment for "aiming his car at a Vermont State Police cruiser." After arraignment, the court released defendant on $5000 cash bail.

¶ 3. Defendant's situation became more complicated when, in February 2003, he was charged with possession of marijuana and another offense of attempting to elude. Although these charges are not currently on appeal, they are indirectly involved in the first issue — the claim that the bail forfeiture was improper. The conditions of release on these charges were made concurrent with those on the earlier charges so that the $5000 cash bail also secured defendant's appearance on the later charges.

¶ 4. Defendant has a history of paranoia, beginning with a diagnosis of paranoid schizophrenia in 1979. In March 2003, a psychiatrist, Dr. Jonathan Weker, examined defendant and determined that he was competent to stand trial, but that his "mental illness deprived him of the capacity to conform his conduct to requirements of law." Dr. Weker's report chronicled defendant's belief that he was being targeted by law enforcement agencies, specifically that he "seemed quite fixed in the delusional belief that the Department of Justice and the U.S. Attorney in Burlington have conspired against him, and that the police want to put him in jail or, ideally, to kill him." He found that

defendant had "disordered thought at the time of the alleged offenses" and that these thoughts "would have overridden Mr. Brown's … ability to conceptualize alternative courses of action." Specifically, he concluded that defendant believed that responding to the police command to stop would "put his life in jeopardy." On March 28, 2003, defendant filed a notice of intent to offer an insanity defense, indicating that Dr. Weker would testify on his behalf.

¶ 5. In April 2003, defendant's situation became even more complicated when federal authorities arrested him on a separate drug charge and placed him in the custody of U.S. Marshals. As a result of this arrest and incarceration, defendant was absent at an April 9, 2003 calendar call on the offenses charged in February and a status conference on all charges on April 29. Defendant's attorney attempted to excuse the absence, explaining that defendant was in federal custody. Nonetheless, the State filed for bail forfeiture and, after a hearing, the court granted forfeiture of defendant's bail on August 7, 2003.

¶ 6. Another outcome of his federal arrest was that defendant sought to cooperate with federal authorities. To be free to do so, defendant signed a stipulation with the State whereby the State agreed to strike pending warrants against defendant and modify his conditions of release and defendant agreed to permanently waive his right to assert an insanity or diminished capacity defense "or any other mental health defense." Soon after his release, defendant was arrested again for DUI and was thus unable to cooperate with federal authorities. He then filed a renewed notice to assert an insanity defense. The trial court denied defendant an opportunity to do so, based on the stipulation.

¶ 7. After the jury was empaneled, defendant moved to dismiss counsel and represent himself. The court questioned defendant and ultimately granted the motion. At trial, defendant's primary defense to the charge of reckless endangerment was that he did not aim at the police cruiser. During deliberations, the jury submitted a question to the court inquiring as to whether aiming was an essential element of the reckless endangerment charge. The court answered that aiming was not an element of the charge, but was instead part of the language used by the State in its charging information to describe the defendant's conduct.

¶ 8. The jury convicted defendant on all counts. Defendant filed a motion for a new trial, which the court denied. Defendant then filed this appeal.

## I.

¶ 9. Defendant argues that the court erred in forfeiting his bail for failure to appear. Defendant claims that the forfeiture is erroneous because his presence was not required at the calendar call and status conference and because federal incarceration within the state is not grounds for forfeiture where the defendant is available for trial. Defendant first contends that because the Windsor District Court does not order that incarcerated defendants be transported to attend status conferences, the court may not punish defendant for his failure to appear at such a proceeding. The State responds that absolving defendant of his responsibility to attend court proceedings would negate the deterrent effect of bail because defendant chose to engage in the illegal conduct that precipitated his arrest by federal authorities which in turn made him unable to attend the hearing.[1]

¶ 10. Under 13 V.S.A. § 7560a, a court is authorized to forfeit bail if it finds that the person failed to appear at a hearing where appearance was required. We review the court's decision for an abuse of discretion. See *State v. Hutchins*, 134 Vt. 441, 443, 365 A.2d 507, 508 (1976) (explaining that it is within the court's discretion to allow recovery of forfeited bail). "[T]he sole constitutionally legitimate purpose of monetary conditions of release is to provide 'additional assurance of the presence of the accused.'" *State v. Cardinal*, 147 Vt. 461, 464, 520 A.2d 984, 986 (1986) (quoting *Stack v. Boyle*, 342 U.S. 1, 5 (1951)). Under our policy, forfeiture of bail exists not as a punitive tool, "but rather to assure that the defendant will appear at court when *required*." *Id.* (emphasis added). Therefore bail may not be forfeited for breach of conditions other than appearance because doing so

---

[1] The State also submits that defendant did not preserve this argument because he failed to raise it at the status conference. We do not understand how defense counsel's actions at the status conference are relevant because the State's motion to forfeit bail was not filed until the day after the status conference. In fact, the forfeiture motion appears to have been made in response to the suggestion of the judge who, when defense counsel objected to any forfeiture motion, said that any argument on whether forfeiture is appropriate should come at the forfeiture hearing. In his written opposition and at that hearing, defendant raised both arguments now presented on appeal. In general, the purposes of requiring a timely objection and presentation of argument is to "let the opponent correct the error, to inform the court so it can rule intelligently and quickly, and to reduce the necessity for reversal ...." *State v. Bissonette*, 145 Vt. 381, 392, 488 A.2d 1231, 1237 (1985). We conclude that defendant's presentation of his arguments in his opposition and at the hearing fulfilled these purposes.

"transforms monetary bail from a guarantor of appearance into a potentially punitive tool useful in the enforcement of all bail conditions." *Id.*

¶ 11. After a hearing, which consisted only of oral argument by the lawyers without evidence, the trial court found that defendant had been required to attend both the status conference and the earlier calendar call. Thus, the trial court found defendant to have breached the conditions of release requiring him to "PERSONALLY APPEAR IN COURT AS REQUIRED BY NOTICE TO THE DEFENDANT OR DEFENDANT'S ATTORNEY."

¶ 12. We find two weaknesses in the court's reasoning. The first involves the requirement that defendant personally appear at the two hearings. The requirement that defendant appear at the status conference was based on a computer-generated notice that stated "Defendant must be personally present. FAILURE TO APPEAR MAY RESULT IN AN ARREST WARRANT BEING ISSUED." Apparently, every notice of court hearing issued by the court clerk contains this notice. We cannot find in the record, however, any notice concerning the calendar call. The docket entry simply indicates that a calendar conference was held by the court manager.

¶ 13. The court did not explain how it concluded that defendant was required to appear for the calendar call. With no evidence presented in support of the bail forfeiture motion, the court was apparently relying upon judicial notice of the court records, but those records contain no evidence that defendant was directed to appear at the calendar call.

¶ 14. The situation with respect to the status conference is more complicated. A defendant is not required to attend "a conference or argument upon a question of law." V.R.Cr.P. 43(c)(3). In addition, the commentary to the rules on pretrial conferences note that the defendant's presence is not required and that "it may be best to hold it without him." Reporter's Notes, V.R.Cr.P. 17.1. The rules do provide for a status conference, V.R.Cr.P. 12(e), but its function is broad and vague. See Reporter's Notes to 1982 Amendment, V.R.Cr.P. 12 (explaining that "the function of the status conference is far less specific" than its predecessor, the omnibus hearing). In practice, it appears to be a generic label for a hearing on matters not otherwise covered by a specific proceeding under the rules. The docket entry reflects that the April 29 status conference was called to determine how to proceed in light of defendant's federal charges and incarceration. The transcript of the status conference, nine pages in length, reflects that the conference was very brief and focused on the interre-

28

lationship of the federal and state proceedings and defendant's bail status in light of the federal charges.

¶ 15. The trial court never specified the source of the requirement that defendant appear at the status conference. Defense counsel never raised the consistency of a direction to appear with Rules 17.1 and 43(c) in the context of this case, and the court never considered the question. Because we reverse on other grounds, we do not reach the question. We do believe, however, that this issue of the potential inconsistency between Rule 43(c)(3) and the computer-generated form warrants review by our criminal rules committee, and we refer the issue to them.

¶ 16. The second weakness results from the court's policy with respect to the transport of incarcerated defendants for status conferences. It is undisputed that the policy, imposed for budgetary reasons, was that the court did not order the transport of incarcerated defendants for status conferences unless there was a notice of a plea agreement. The trial court decided, however, that because the State did not incarcerate defendant and had no authority to issue a transport order, the policy was inapplicable and, therefore, defendant's presence was required.

¶ 17. We cannot accept the trial court's reasoning. The proper method of obtaining defendant's presence at a state proceeding was demonstrated by his appearance at the forfeiture hearing. The trial court described the procedure:

> On June 6, 2003, [defendant's attorney] requested the court to issue a *Writ of [Habeas] Corpus Ad Prosequendum* requesting the United States Marshall to release the Defendant into the custody of the Windsor County Sheriff for delivery to the hearing on July 2nd. The court signed the requested writ. The federal government agreed to the request and released the Defendant for purposes of attendance at the hearing only, following which he was returned to their custody.

It is clear from this description that the procedure for obtaining the presence of a federally-incarcerated prisoner in state court requires a transport order, just as if the defendant were a state prisoner, in addition to a request for temporary release from federal custody. Because the rationale for the no-transport policy was "to reduce the monies that were expended for transporting of incarcerated people," the policy is just as applicable whether the accused is in federal or state custody. Therefore, we conclude that the court's policy of nontransport for incarcerated defendants applied in this case, and consequently bail

forfeiture was erroneous because defendant did not fail to appear at a proceeding where his presence was required. Compare *People v. Classified Ins. Corp.*, 210 Cal. Rptr. 162, 165 (Ct. App. 1985) (holding that trial court erred in forfeiting bail for nonappearance at hearing where defendant's presence was not legally required), with *People v. Sacramento Bail Bonds*, 258 Cal. Rptr. 130, 132-33 (Ct. App. 1989) (affirming forfeiture for failure to appear at status conference where rule required defendant's presence).

¶ 18. Having decided that in this case the court erred in forfeiting bail, we do not reach defendant's second argument that federal incarceration in the state is not grounds for forfeiture if defendant is still available for trial.

## II.

¶ 19. Next, defendant submits that he did not knowingly, voluntarily, or intelligently waive his right to counsel. A defendant may waive his right to counsel if he is mentally competent and does so "knowingly, with full awareness of the consequences of the waiver." *State v. Pollard*, 163 Vt. 199, 206, 657 A.2d 185, 190 (1995). We have explained that waiver of counsel may not be presumed from a silent record and the best practice is for the trial court to "conduct sufficient inquiry into the defendant's experience, motives, and understanding of what he is undertaking to determine the quality of his purported waiver, and then to provide a clear explanation of the adverse consequences of pro se representation." *State v. Merrill*, 155 Vt. 422, 425, 584 A.2d 1129, 1131 (1990) (citation omitted). On review, we may consider evidence outside the trial court record. *Id.* at 426, 584 A.2d at 1131-32.

¶ 20. Defendant was represented through the jury draw but discharged counsel just before the opening statements. The court conducted an extensive colloquy with defendant and made oral findings on the record concluding that the waiver of counsel was knowing, voluntary and intelligent. Defendant claims that the waiver was nevertheless defective because the court did not explain the range of sentences he might face if convicted and failed to inquire as to his motives in waiving counsel. The State contends that the court adequately questioned defendant and that, considering the totality of the circumstances, defendant's waiver was informed and voluntary.

¶ 21. We agree with the State and find no error in the trial court's determination that defendant's waiver of counsel was knowing, voluntary, and intelligent. Defendant was charged with three misdemeanors, the most serious of which, reckless endangerment, has

a maximum penalty of one year in jail and a $1000 fine. See 13 V.S.A. § 1025. We said in *Merrill* that a "defendant may need to be advised of the ... range of allowable punishment." 155 Vt. at 425, 584 A.2d at 1131; accord *Pollard*, 163 Vt. at 207, 657 A.2d at 190-91 (quoting *Merrill*). Based upon the record, we cannot find any place where defendant was so advised. Nevertheless, we do not view this as the kind of case where the lack of such advice is critical. Defendant was provided with all the other information necessary to decide whether to waive counsel. We do not believe that knowledge of the range of possible punishments for these misdemeanors could have affected defendant's decision.

■ ¶ 22. We reach a similar conclusion as to defendant's argument that the court failed to inquire about his motives in waiving counsel. We explained in *Merrill* that the trial court should conduct a "sufficient inquiry" into defendant's motives and other factors "to determine the quality of his purported waiver" and "provide a clear explanation of the adverse consequences of pro se representation." 155 Vt. at 425, 584 A.2d at 1131. The court made findings on the quality of the waiver and explained to defendant in detail the potential adverse consequences of pro se representation. The court did not need to ask specifically about defendant's motives because defendant explained them. Defendant viewed counsel as "just part of this whole deal" and "hooked up with the Court" because "[y]ou guys all know each other. It's all a conspiracy." He said that he had represented himself in the past and was satisfied with his self-representation, "more satisfied than [he'd] ever been with any attorney." There was no need to inquire further about defendant's motives.

¶ 23. This case is distinguishable from *Merrill*, where the trial court did not inquire as to defendant's understanding of his right to counsel at all. In this case, the court discussed with defendant his decision to represent himself. This case also differs from *Pollard*, where the court failed to inquire about defendant's education and background, his past self-representation, his motives and his understanding of the proceeding. 163 Vt. at 207-08, 657 A.2d at 191. Here, the trial court inquired regarding most of these points, only failing to ask specifically about defendant's motives. Examining the entire circumstances, we affirm the court's conclusion that defendant's waiver of counsel was knowing, voluntary, and intelligent.

## III.

¶ 24. Defendant also claims that he did not knowingly, voluntarily or intelligently waive his right to assert an insanity defense, and thus the court erred in denying him an opportunity to reinstate this defense. We conclude, as explained below, that the stipulation did not validly waive defendant's right to present a mental health defense.

¶ 25. The facts surrounding defendant's waiver of an insanity or diminished capacity defense are complex and are not fully explained in the record. On March 28, 2003, defendant filed notice with the district court of his intention to present an insanity defense, based on Dr. Weker's conclusion that defendant was insane at the time of the offense. Following defendant's arrest on federal drug charges, defendant sought to cooperate with federal officials to obtain a decreased federal sentence. In order to cooperate, defendant had to be free from incarceration. That freedom in turn required state action because, after the April 29 status conference at which defendant did not appear, the court modified defendant's conditions of release to increase the bail amount to $25,000 and issued arrest warrants because of his nonappearance. Thus, even if defendant were released pending the federal charges, he would immediately be reincarcerated under the state arrest warrants and because his bail filing was insufficient under the new order.[2]

¶ 26. The barrier to defendant's cooperation was removed when defendant and the State executed a stipulation to strike the warrants and modify defendant's conditions of release to allow an unsecured appearance bond to substitute for cash bail. The stipulation also provided that defendant agreed to "waive permanently his right to assert a defense of insanity or diminished capacity or any other mental health defense." Defendant, his attorney, and the State all signed the stipulation. The stipulation was filed with the court on August 7, 2003, and the court issued an order that day striking the arrest warrants and modifying the conditions of release pursuant to the stipulation.

¶ 27. Apparently, the new conditions of release order, combined with action by the federal court, resulted in defendant's release from custody because, on August 13, 2003, defendant was arrested for DUI, fourth offense, and again incarcerated, preventing him from cooperating further with federal authorities. Soon thereafter, on September 9,

---

[2] In addition, the bail forfeiture decision was pending so it is doubtful that defendant could be considered as having any bail on file.

2003, defendant filed a renewed notice to offer evidence of insanity. On the same day, defense counsel moved to withdraw because the State had notified him that, if defendant attempted to reassert an insanity defense, he would be called as a witness at any hearing. Both these filings occurred on the date of a status conference, which the court led off by stating "I don't think we need to address this renewed notice because it's been waived." That comment led to further discussion of the notice and the motion to withdraw, with defense counsel stating "I need to withdraw from this case, Your Honor, because there are arguments to present in support of that renewed notice that make me a witness in this case and directly implicate Rule 3.8." The court responded that defense counsel's concerns were "hypothetical, based on a possible hearing at which you would be called as a witness. There's not going to be a hearing."[3]

¶ 28. Defendant claims that the stipulation was void because the court did not inquire as to his motives or to his understanding, or inform defendant of the consequences of the waiver prior to accepting it. Therefore, defendant submits that he should have been permitted to present an insanity defense at trial. The State argues that the trial court is not required to engage in a colloquy with defendant prior to accepting a waiver of the insanity defense, that defendant made a deliberate choice to waive the defense, and that defendant's inability to benefit from it was entirely of his own making.

¶ 29. Defendant relies on a line of cases commencing with *Frendak v. United States*, 408 A.2d 364 (D.C. 1979). The issue in *Frendak* arose in a context dramatically different from that before us in this case. In *Frendak*, a jury found defendant guilty of first-degree murder. Over defendant's objection at the second trial, the court required the jury to determine whether defendant was insane at the time of the offense. From the second verdict of not guilty by reason of insanity, defendant appealed arguing that she validly waived the insanity defense. The appellate court held that a trial judge "may not force an insanity

---

[3] The above exchange did not end the discussion, but the ruling did not change. Defense counsel explained in more detail what he saw as his ethical dilemma and why it prevented him from filing a motion to set aside the waiver. The court recited the in-court events on the day of the waiver, all of which occurred in chambers or at the counter in the clerk's office with the prosecutor and defense counsel, but not defendant, present. The judge indicated that the stipulation was done to help defendant in his federal cases and she was somewhat reluctant to implement it. Finally, the court restated that it would not consider the renewed notice of insanity because "[i]t is a non-issue," and denied the motion to withdraw because it was mooted by the court's decision.

defense on a defendant found competent to stand trial *if* the individual intelligently and voluntarily decides to forego that defense." *Id.* at 367. The court acknowledged that defendants have good reasons for choosing. not to assert a potentially successful insanity defense, including confinement in an institution, required treatment, resultant stigma, and other collateral consequences. *Id.* at 376-78; see also *State v. Bean*, 171 Vt. 290, 300-01, 762 A.2d 1259, 1266 (2000) (holding that the decision to assert an insanity defense rests with the defendant because defendant bears the consequences of the decision).[4] Consequently, the *Frendak* court concluded that "if a defendant has acted intelligently and voluntarily, a trial court must defer to his or her decision to waive the insanity defense." 408 A.2d at 378. *Frendak* has been widely followed under its unique circumstances. See, e.g., *State v. Fayle*, 658 P.2d 218, 229 (Ariz. Ct. App. 1982) (applying *Frendak* rationale); *People v. Gettings*, 530 N.E.2d 647, 650 (Ill. App. Ct. 1988) (following *Frendak* and requiring trial judge to conduct inquiry of defendant's understanding and motives before defendant may waive insanity defense); *State v. Khan*, 417 A.2d 585, 591 (N.J. Super. Ct. App. Div. 1980) (finding "formula enunciated by *Frendak* to be largely persuasive"); *City of Bismarck v. Nassif*, 449 N.W.2d 789, 798 (N.D. 1989) (requiring *Frendak*-type inquiry); *State v. Peterson*, 689 P.2d 985, 991 (Or. Ct. App. 1984) (finding *Frendak* approach consistent with Oregon law); *State v. Jones*, 664 P.2d 1216, 1220 (Wash. 1983) (accepting holding of *Frendak*); J. Dunlap, *What's Competence Got to Do with It: The Right Not to Be Acquitted by Reason of Insanity*, 50 Okla. L. Rev. 495, 509 (1997) (noting that *Frendak* "has enjoyed wide influence").

¶ 30. We rejected the application of *Frendak* in *State v. Davignon*, 152 Vt. 209, 216-22, 565 A.2d 1301, 1305-08 (1989), and the State cites that case for the proposition that waiver of the insanity defense does not require an inquiry by the court. In *Davignon*, the defendant gave notice that he would rely on a defense of insanity but never actually

---

[4] *Bean* discusses parts of *Frendak*, but does not explicitly adopt or reject the reasoning in those parts. For example, *Frendak* requires a higher level of competency to waive an insanity defense than to stand trial. 408 A.2d at 379-80. In *Bean*, we did not answer the question of "whether a higher standard of competency must be met before a defendant, found competent to stand trial, can knowingly and intelligently waive an insanity defense." 171 Vt. at 302, 762 A.2d at 1267. In this case, defendant has not raised competency on appeal. Thus, we do not reach this issue, and we consider only whether defendant knowingly and voluntarily waived the defense, not whether he was competent to do so at the time.

went forward with the insanity defense, instead relying upon a diminished capacity defense. On appeal, the defendant claimed that the court should have taken affirmative action to insure that defendant intelligently and voluntarily forewent the insanity defense. We examined *Frendak*'s requirement that the trial court "take some steps on the record to determine whether any purported waiver of the insanity defense was voluntarily and intelligently made by the defendant." *Id.* at 219, 565 A.2d at 1307. We concluded that such a requirement did not apply and, under the circumstances, the court was not required to conduct a colloquy with the defendant to ascertain that the waiver was done knowingly and voluntarily. *Id.* at 221, 565 A.2d at 1308.

¶ 31. Irrespective of our view of the *Frendak* requirements, we do not believe that *Davignon* contained a blanket rejection of the *Frendak* requirements. It held explicitly that the "*Frendak* line of cases [does not] apply to this case." 152 Vt. at 219, 565 A.2d at 1307. Its reasons for rejecting the applicability of *Frendak* show that *Davignon* is not controlling here.

¶ 32. First, *Davignon* did not involve a true waiver of the insanity defense, at least in the way it occurred here. Thus, we emphasized in *Davignon* that, although defendant abandoned his insanity defense, he presented a diminished capacity defense that better fit the facts and the evidence adduced through his expert witness. *Id.* at 221, 565 A.2d at 1307-08. The jury heard all of the expert testimony attacking defendant's ability to form the requisite intent and concluded that the defendant did not suffer from a mental disease. Consequently, on appeal we determined that raising insanity would not have had an impact on the defendant's case. *Id.* at 221, 565 A.2d at 1308.

¶ 33. In stark contrast, in this case, defendant's stipulation with the State *permanently* waived his ability to assert "a defense of insanity or diminished capacity or any other mental health defense." As a result, defendant was barred from presenting any evidence, including expert testimony, regarding his mental state at trial, and the jury never heard and considered Dr. Weker's opinion that defendant was insane at the time of the offenses.

¶ 34. Second, in *Davignon*, we surmised that the choice to assert diminished capacity rather than insanity was the defendant's tactical trial decision and not a waiver of an "essential element[] of a criminal trial." *Id.* Here, the stipulation was the functional equivalent of a guilty plea, at least as to most of the charges, because it permanently waived the only real defense that might have been available. Apparently, it

was, as defense counsel stated, "essentially a negotiated disposition, assuming all went well." While it was a tactical decision in relation to the federal charges, it was de facto a waiver of the essential right in a criminal trial to present a defense. See *Washington v. Texas*, 388 U.S. 14, 18-19 (1967) (explaining that the Sixth Amendment guarantees an accused the right to present a defense and witnesses to establish that defense); *Bean*, 171 Vt. at 301, 762 A.2d at 1266 (explaining that defense of insanity is essentially a plea). For a change of plea, the trial court must conduct the kind of colloquy that defendant claims was required here. See V.R.Cr.P. 11(c) (requiring court to question defendant about charge, penalty, and rights being waived before accepting plea of guilty).

¶ 35. Whereas *Davignon* presented a case where the need for a colloquy was less than in *Frendak*, this case involves circumstances where the need may be greater. The waiver was broader — encompassing any mental health defense — than that in *Frendak*, and was "permanent." Defendant faced a complicated situation with a number of moving parts and needed a clear understanding of the risks before waiving his defense to the state charges. Because the federal charges were of controlling significance, he was in a weak bargaining position with respect to the state charges. The *Frendak* rule is based on the policy that the insanity defense protects "persons who are not legally responsible for their acts from punishment and culpability in the eyes of society." 408 A.2d at 378. The court found that the policy was so strong that waiver of an insanity defense could occur only if the trial court "ensure[s] that the defendant understands the consequences of his or her choice and makes the decision voluntarily" and has the capacity to make an intelligent choice. *Id.* Here, the consequences were greater and more uncertain than normal because multiple proceedings and jurisdictions were involved.

¶ 36. We agree with the balance struck in *Frendak* that the nature of the waiver involved, and the possible limitations on the capacity of the defendant to make intelligent and informed choices, requires the trial court to examine the defendant to ensure that any waiver of an insanity defense is knowing, intelligent and voluntary before acting on the waiver. While *Frendak* involved a different context, we believe that its waiver holding is applicable here. To adequately balance defendant's right to an autonomous decision and the public interest in protecting "an insane person from being held culpable for his actions," the court must engage defendant in a discussion. *Gettings*, 530 N.E.2d at 650. Although we decline to set

detailed requirements for such a discussion, we instruct courts that before accepting a permanent waiver the court should address defendant's knowledge of the insanity defense, his reason for waiving the defense, and his comprehension of the consequences of both waiver and use of the defense. *Id.* (holding that court must conduct inquiry prior to accepting waiver of defense and listing elements of such a discussion). In imposing this requirement, we continue to adhere to the distinction made in *Davignon* that such a discussion is unnecessary if defendant will place his mental capacity in issue in another way.

¶ 37. We recognize that in reaching this holding, we may be undermining the flexibility that is sought by the defendant. Through counsel, defendant wanted the court to immediately approve and implement the stipulation so that he could cooperate with the federal authorities. Requiring a hearing with defendant present may have delayed his release significantly. We conclude, however, that the delay is a necessary price to pay to ensure that defendant engages in a knowing, intelligent and voluntary waiver.

¶ 38. We also acknowledge that part of our concern on this record is that a waiver not be coerced by the opportunity available to defendant and the bargaining position of the parties. We have expressed concern about the waiver of some statutory rights in plea negotiations, see *State v. Buck*, 139 Vt. 310, 314-15, 428 A.2d 1090, 1093 (1981) (holding that because the right to appeal was conferred by statute, "its restriction or prohibition as a condition of sentence deferment or probation cannot be reconciled with that statute"), and that concern is particularly relevant if no "direct correlation" between the right being waived and the benefit to defendant is present. *State v. Hance*, 157 Vt. 222, 224-25, 596 A.2d 365, 367 (1991). The record does not tell us if concern is justified in this case, and that is part of the reason for requiring a trial court inquiry.

¶ 39. We hold that where a defendant attempts to waive all mental health defenses, and the record demonstrates that the defendant has sufficient evidence to get to the jury on one or more of these defenses, the trial court must inquire as to defendant's understanding of the consequences of such a waiver as described above. Here, the trial court accepted the stipulation without questioning defendant or

explaining to him the outcome of his agreement. Accordingly, defendant's stipulation was invalid, and he is entitled to a new trial.[5]

## IV.

¶ 40. Defendant last claims that the court erred in advising the jury that the prosecution was not required to prove that defendant "aimed" his car at the police cruiser in order to satisfy the elements of the reckless endangerment charge.[6] The information for this charge stated that defendant did "recklessly engage in conduct which placed another person in danger of serious bodily injury by aiming his car at a Vermont State Police cruiser knowing the cruiser to be occupied while traveling at a high rate of speed in violation of 13 VSA § 1025." During deliberations, the jury submitted the following question to the court: "In charge three, if element is 'actions placed Trooper in danger,' does the state have to prove danger was because Mr. Brown *aimed* car toward cruiser? In other words — is 'aiming' a part of the third element of the third count." After discussion with the parties, the court instructed the jury as follows:

> Aiming the car is not an essential element of the charge of reckless endangerment. It is part of the language used by the State in its charging information to describe the defendant's conduct. Aiming the car is a part of the conduct which the State alleges meets the essential elements of reckless endangerment. The essential elements of the charge of reckless endangerment are that on the date and at the place alleged, first, Theodore Brown, Jr.; second, recklessly engaged in conduct; third, which placed Trooper Paul Gauthier in danger; fourth, of death or serious bodily injury. You need to consider the instructions on reckless endangerment given to you by the Court as a whole in making your determination whether or not the State has proven that the defendant recklessly engaged in conduct which placed the trooper in danger of death or serious bodily injury.

---

[5] Although there may be an issue as to whether the insanity defense can be raised in response to the attempting to elude charge because it is a strict liability offense, neither party has raised this issue on appeal. We therefore decline to address the question and remand for a new trial on all charges.

[6] Although the reckless endangerment conviction must be set aside because defendant was prevented from asserting a mental health defense, we consider this additional ground for reversal, briefed by the parties, because it may again arise at a retrial.

¶ 41. Defendant argues that this instruction failed to properly explain the State's burden of proof. Defendant relies on *State v. Aiken*, 2004 VT 96, ¶ 4, 177 Vt. 566, 862 A.2d 285 (mem.), a case with very similar facts where the judge, in answer to a jury question, told the jury that it was not confined to the language in the information to determine whether the defendant's actions met the elements of grossly negligent driving. We reversed and explained that where the State alleges particular conduct in the information, and the evidence at trial focuses on that conduct, defendant will be prejudiced if the State is permitted, at the last minute, to prove the offense through other means. *Id.* ¶¶ 12-14.

¶ 42. In this case, the information clearly states that the State chose to rely on specific conduct, and as in *Aiken*, defendant relied upon the statement in the information to present a defense. Thus, under *Aiken*, the State was required to prove that defendant aimed his car at the police cruiser in order to obtain a conviction for reckless endangerment. The State concedes this point, but argues that although the instruction was "somewhat inartfully worded," it was sufficient to explain to the jury what the State had to prove.

¶ 43. On appeal, we review jury instructions in their entirety and will reverse only when "the entire charge undermines confidence in the verdict." *State v. Lambert*, 2003 VT 28, ¶ 14, 175 Vt. 275, 830 A.2d 9 (quotations omitted). The jury instruction in this case cannot meet this standard because its errors and poor construction bring into question the verdict's validity.

■ ¶ 44. The jury specifically asked whether the State had to prove that defendant aimed his car at the cruiser and additionally restated the question: "in other words — is 'aiming' a part of the third element of the third count." Under the State's theory, the restatement of the question controls, and it does not ask whether the State had to prove "aiming." Instead it asks a fine point of law, whether "aiming" is technically an element of the crime, although that point is irrelevant to the jury's responsibility. We do not believe that a reasonable juror would have understood from the court's response that the State had to prove that defendant aimed his car at the state police cruiser. Under these circumstances, we conclude that a new trial is necessary.

*The district court's order forfeiting bail is reversed; funds surrendered pursuant to the order shall be returned. Defendant's convictions are reversed and the matter is remanded for a new trial.*