2006 VT 26

## State of Vermont v. Kenneth H. Squiers

[896 A.2d 80]

No. 04-499

Present: **Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.**

Opinion Filed March 24, 2006

---

*William D. Wright*, Bennington County State's Attorney, and *David R. Fenster*, Deputy State's Attorney, Bennington, for Plaintiff-Appellee.

*Allison N. Fulcher* of *Martin & Associates*, Barre, for Defendant-Appellant.

¶ 1. **Burgess, J.** Defendant Kenneth Squiers appeals from his jury conviction for committing a lewd act with a child under the age of sixteen in violation of 13 V.S.A. § 2602. On appeal, defendant claims the trial court erred by: (1) denying his motion for judgment of acquittal when the evidence was insufficient to prove that he committed or attempted to commit a lewd or lascivious act; and (2) denying his motions for a mistrial and a new trial based on a juror's misconduct. We affirm.

## I.

¶ 2. We first address defendant's argument that the State's evidence was insufficient to convict him of the charged offense. In reviewing a denial of a V.R.Cr.P. 29 motion for judgment of acquittal, we view the evidence presented by the State in the light most favorable to the prosecution, excluding any modifying evidence, and determine whether the State's evidence sufficiently and fairly supports a finding of guilt beyond a reasonable doubt. See, e.g., *State v. Grega*, 168 Vt. 363, 380, 721 A.2d 445, 457 (1998). Given this standard, the facts are summarized as follows.

¶ 3. The complainant is defendant's granddaughter, B.P., who was fourteen years old at the time of the alleged misconduct. B.P., her mother, stepfather, and younger sister moved in with defendant after they were evicted from their apartment. After living there for a few weeks, B.P. was getting ready to leave for school when her grandfather asked her for a hug. B.P.'s mother and sister were waiting in the car, and defendant and B.P. were alone in the house. B.P. thought nothing improper of defendant's request because he was her grandfather. When defendant hugged B.P., he squeezed her very tightly, pressing his chest firmly against hers. During this contact, defendant commented: "[T]hese feel firm, am I ever going to be able to touch them or see them?" Defendant then moved his hand up and B.P., believing defendant was going to touch her breasts, turned away and left before he could do so.

¶ 4. Some weeks later, defendant entered B.P.'s bedroom while she was using her computer and asked her to look up some information on the internet. As she was typing, defendant reached over, touched her on the middle of her thigh and moved his hand up her leg until she pushed his hand off and told him "not to do that." At the time she pushed his hand off her leg, his hand was within two inches of her "vaginal area." Defendant replied that he "should behave himself" and "he knew that he shouldn't being doing that type of stuff" with

her. She told him to get out of her room, and he left, but came back minutes later, declaring "I need to be around you, I need to touch you, you wind me up like a clock." B.P. felt uncomfortable and went to her mother's bedroom. She did not tell her mother about her grandfather's actions because she did not want her family to be homeless again.

¶ 5. Two days later, B.P. was in the kitchen washing dishes. Defendant came up behind her and began rubbing her shoulders, neck, and ears, and sniffing her hair. She told him to leave her alone and he left. B.P. was again in the kitchen doing dishes, a week or so later, when defendant came up behind her, put his hand on her shoulder, and whispered in her ear, "when are we going to be able to make love?" B.P. swore at defendant and told him he needed to leave her alone. He turned around, chuckling, and told her, as he was walking away, that he didn't think he should have to do anything he didn't want to do because it was his house. B.P. was scared and ran, screaming and crying, into her mother's room and told her everything that had happened. They moved out the next day, and the foregoing events were reported to the Department of Social and Rehabilitation Services (now named the Department of Children and Families).

¶ 6. Following an investigation, defendant was charged and convicted of violating 13 V.S.A. § 2602, which prohibits lewd or lascivious conduct with a child. The statute provides:

> A person who shall wilfully and lewdly commit any lewd or lascivious act upon or with the body, or any part or member thereof, of a child under the age of sixteen years, with the intent of arousing, appealing to, or gratifying the lust, passions or sexual desires of such person or of such child, shall be imprisoned for the first offense, not less than one year nor more than five years, or fined not more than $3,000.00, or both . . . .

*Id.* The trial court instructed the jury to consider, for the element of a "lewd act," only two incidents alleged: (1) defendant hugging B.P., "pressing her breasts against him"; and (2) defendant touching B.P.'s leg and "moving his hand up her thigh." The court further instructed the jury that any other acts and comments made by defendant could be used only to determine defendant's intent and the lack of a mistake or accident. Additionally, the court instructed the jury that "lewd" or "lewdly" means "behavior or intent which is lustful or indecent, that

which offends the common morality of the community as well as its sense of decency and propriety."

¶ 7. Defendant argues that the State's evidence was insufficient to support a finding of guilt beyond a reasonable doubt because the actual acts "upon the body" of the child were not in and of themselves lewd. Defendant submits that any lewdness was in his comments, and not in his touching. Defendant claims his hug, however tight, was nothing more than a hug, which always involves breast-to-breast contact, and so cannot be criminally actionable, notwithstanding his simultaneous comments: "[T]hese feel firm, am I ever going to be able to touch them or see them?"

¶ 8. Defendant also argues that his touching of B.P.'s thigh cannot be considered lewd because there was "no touching, rubbing, fondling or kissing of any private, sexual part of the body." Defendant also claims that the "mere sliding" of his hand up B.P.'s thigh cannot be considered criminal because it is only conjectural whether defendant would have touched her vagina.[1]

¶ 9. We reject defendant's contention that the statutory meaning of a "lewd act" upon a child is limited to contact with a so-called "private" or "sexual" part of the child's body. Our overriding objective in statutory interpretation is to effectuate the intent of the Legislature. *State v. Dixon*, 169 Vt. 15, 17, 725 A.2d 920, 922 (1999). In doing so, we first look to the plain, ordinary meaning of the statutory language. *Id.* The plain language of the statute refers to a lewd act "upon or with the body, *or any part or member thereof*, of a child." 13 V.S.A. § 2602 (emphasis supplied). If the Legislature intended to limit the definition of a lewd act to contact with or between particular body parts, it could have done so, as demonstrated by the specific language used in other statutes that prohibit misconduct of a sexual nature. See 13 V.S.A. § 3251(1) (defining "sexual act" for purposes of sexual assault statute as "conduct between persons consisting of contact between the penis and the vulva, the penis and the anus, the mouth and the penis, the mouth and the vulva, or any intrusion, however slight, by any part of a

---

[1] The court instructed the jury that if they found defendant not guilty of the charged offense, they could consider whether defendant was guilty of the lesser-included offense of attempting to wilfully and lewdly commit a lewd act with the body of a child. Because the jury convicted defendant of the charged offense, our consideration of the sufficiency of the evidence relates only to a completed violation of § 2602.

person's body or any object into the genital or anal opening of another"); 13 V.S.A. § 2605(a)(4) & (b) (prohibiting the viewing or recording of the "intimate areas" of another person where he or she has a reasonable expectation of privacy and defining "intimate areas" as "the naked or undergarment-clad genitals, pubic area, buttocks, or female breast of a person").

¶ 10. We conclude that the purpose of § 2602 is to protect children from sexual exploitation by any form of physical contact initiated for that purpose. While evidence that a defendant touched a child's genital area might present a more obvious case, we decline to hold that the sexual use of children prohibited by § 2602 is limited to contact with any particular body part.[2] In other words, the actual lewd "act upon or with" the body of a child cannot be viewed in isolation from the context in which the touching occurs and, in particular, the intent of the perpetrator. See *People v. Martinez*, 903 P.2d 1037, 1038 (Cal. 1995) ("Whether a particular touching is 'lewd' and criminal . . . cannot be determined separate and apart from the actor's intent."). We agree with the California Supreme Court's construction of that state's nearly identical statutory language that "a lewd or lascivious act can . . . involve 'any part' of the victim's body." *Id.* at 1042 (quoting Cal. Penal Code § 288(a)).[3]

¶ 11. Accordingly, we conclude that the determination of whether an act is "lewd" under § 2602 depends on the nature and quality of the contact, judged by community standards of morality and decency in light of all the surrounding circumstances, accompanied by the requisite, specific lewd intent on the part of the defendant. Cf. *In re P.M.*, 156 Vt. 303, 308, 592 A.2d 862, 864 (1991) (noting this Court's deference to common-sense community standards when considering, under the facts of the particular case, whether conduct

---

[2] Nor do we deem a contact per se "lewd" because it involves contact with a "private" part of a child's body. Such contact may occur in a variety of legitimate contexts by parents, physicians, or other caretakers.

[3] Cal. Penal Code § 288(a) provides:

> Any person who willfully and lewdly commits any lewd or lascivious act . . . upon or with the body, or any part or member thereof, of a child who is under the age of 14 years, with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of that person or the child, is guilty of a felony and shall be punished by imprisonment in the state prison for three, six, or eight years.

is lewd or lascivious under § 2602); *State v. Purvis*, 146 Vt. 441, 443, 505 A.2d 1205, 1207 (1985) (holding criminal intent under statute prohibiting lewd and lascivious conduct implicated where, in deference to the "common sense of the community," factors including the defendant's "intentional public exposure of himself, with a view to excite unchaste feelings and passions ... calculated to outrage the feelings of the person, to whom he thus exposed himself," as opposed to mere nudity, made his conduct punishable) (internal quotations omitted). As the California Supreme Court emphasized in *Martinez*, the fact finder has a critical role in examining the manner of the touching to conclude whether a lewd act occurred:

> [T]he trier of fact looks to all the circumstances, including the charged act, to determine whether it was performed with the required specific intent. Other relevant factors can include the defendant's extrajudicial statements, other acts of lewd conduct admitted or charged in the case, the relationship of the parties, and any coercion, bribery, or deceit used to obtain the victim's cooperation or avoid detection.

*Martinez*, 903 P.2d at 1043 (internal quotations and citations omitted); cf. *State v. Roy*, 140 Vt. 219, 230, 436 A.2d 1090, 1095 (1981) ("[T]he specific intent requirement in [§ 2602] alleviates any problem with vagueness.").

¶ 12. In denying the motion for judgment of acquittal, the district court stated that "[a]lthough the alleged acts could have been innocent contact, the jury had the additional evidence of the defendant's verbal remarks concerning his intent and state of mind as to the acts and other evidence of the surrounding circumstances." The court concluded that the "total evidence was sufficient to support the guilty verdict in that [the jury] could have found beyond a reasonable doubt that [defendant's] actions were of a lewd and lascivious nature and not casual family contact." We agree. Ordinarily a hug is just a hug, and a touch on the leg is just a touch on the leg. Here, however, the additional evidence of defendant's accompanying comments reveal that his intent when pressing against his granddaughter's breasts and running his hand up her leg near her groin was expressly lewd, as opposed to innocent or accidental. Defendant's comments while pressing B.P.'s breasts very tightly against his own chest (stating that B.P.'s breasts felt firm and inquiring whether he would be able to touch or see them), and while running his hand up her leg within two inches of her vagina (admitting that he knew it was improper,

but that he had to touch her because she "[wound] him up like a clock"), provided sufficient evidence for the jury to conclude that these physical contacts were not displays of grandfatherly affection. Rather, the jury had more than sufficient evidence to conclude that the contacts with B.P.'s body, feeling her breasts, and feeling up her thigh just short of the child's vagina, were made intentionally and for his express lascivious purposes.

¶ 13. Viewing the totality of the evidence in the light most favorable to the State, the jury had sufficient evidence to conclude beyond a reasonable doubt that this contact was patently offensive, lewd, and with the intent of appealing to defendant's sexual desires, all as charged and as prohibited by statute. Defendant's contemporaneous and subsequent comments linked his acts upon the body of his granddaughter with his explicit sexual desire toward B.P. In light of all the evidence presented, we find no error in the district court's denial of defendant's motion for judgment of acquittal.

## II.

¶ 14. We now turn to defendant's claim that the trial court erred in denying his motions for a mistrial and a new trial based on a juror's misconduct in sharing personal legal research with jurors during their deliberations. Defendant claims that the juror's actions created the capacity to influence and taint the jury such that defendant was entitled to a new trial. Defendant further claims that the court improperly inserted itself into the jury's deliberative process when it delivered a curative instruction, thus compounding the error.

¶ 15. The record reveals the following facts relevant to this issue. Defendant's jury trial lasted only one day, with the State resting its case just prior to the noon hour. Before breaking for lunch, the court instructed the jury not to discuss the case with anyone or try to learn about it during the break. When the jury returned from lunch, the defense rested without presenting any additional evidence, counsel delivered closing arguments, and the court instructed the jury without reference to any particular statutory citation. Nevertheless, during deliberations, the court received a note from the jury that stated: "Under T 13 2601 and 2602 it specifies that speech is not enough to display/prove intent? Does this apply in this case?" The court shared the question with the attorneys who shared concerns that the jury received external information about the law. The attorneys expressed additional concern that the jurors may have learned of the penalty provisions in the statute.

¶ 16. Following this discussion, the court sent a note to the jury directing them to follow only the instructions given by the court, and inquiring about the source of the information in the jury's note. In response, one juror, Mr. Corcoran, was identified as the source of the question. In the presence of counsel and on the record, the court questioned Mr. Corcoran, who explained that he went to the public library during the lunch break and read 13 V.S.A. §§ 2601 and 2602, which prompted him to tell the other jurors during deliberations that he had read "that speech or regular speaking of one's free will" was not enough to convict on a charge of a lewd and lascivious act. Mr. Corcoran said he raised the issue with the other jurors because of defense counsel's comments about speech in closing argument, but that the other jurors referred him back to the court's instructions, commenting that those were the instructions to be followed, while another suggested posing the question to the court. In response to the court's further questions, Mr. Corcoran stated he had learned of the penalties imposed by both statutory provisions, but had not shared that information with the other jurors. The court then asked Mr. Corcoran if he could put aside any impressions he had from reading the statutes and deliberate with the jury solely on the jury instructions given by the court. Mr. Corcoran responded affirmatively.

¶ 17. After asking Mr. Corcoran to wait outside the courtroom away from the other jurors, the court asked counsel whether they would be willing to proceed with an eleven-person jury if the court removed Mr. Corcoran. Defense counsel responded that his client would not agree to an eleven-person jury and would move for a mistrial in the event the court did not remove Mr. Corcoran from the jury. The state's attorney said she would also request a mistrial if Mr. Corcoran were not removed.

¶ 18. The court stated it was inclined to go forward, concluding that what happened was not so gross an error that it could not be cured and emphasizing that the juror's independent research did not involve investigation of facts, but research about the law. The court called Mr. Corcoran back and inquired again if he understood that he needed "to ignore and not consider in any way anything [he] ... interpreted or learned from reading either statute," and the court could not agree that his interpretation was correct. The court asked Mr. Corcoran if he would have any difficulty with that requirement and he replied "[n]o." The court asked if Mr. Corcoran could disregard any memory or information about penalties and whether he

could promise the court he would not relay any such information to the other jurors. Mr. Corcoran responded affirmatively to both propositions and remained on the panel.

¶ 19. The court then brought in the rest of the jury and instructed them that the parties have the right to have the case decided solely on the evidence presented in court and the legal instructions given by the court. The court further stated:

> [A]pparently there was some information that came up from outside of those sources, especially about possible legal interpretation or legal instruction. You need to understand that you cannot consider any of that information that came up no matter how sort of briefly it came up or how limited it came up, that cannot be a part of your deliberations. It is solely the jury instructions given to you by the Court that control how you apply the law to the facts that came in through testimony. I need to even further comment that it is even possible that that information that came up was not correctly interpreted or recalled, okay, but I don't even want to get into whether it was or wasn't, but you need to understand that's how important it is, so you have to ignore it because of that issue, okay. It is not from the Court, it hasn't been reviewed by the attorneys and so it cannot be relied on in any way, so I need an affirmation from each of you that you can basically sort of re-start your deliberations without relying on any of that information that had come up, that you will use the judicial instructions given to you by the Court that each of you have a copy of and that you can do that and fairly apply that law to the facts for both the State and Mr. Squiers and if you cannot please let me know.

The court then asked each juror two questions: whether the juror could go forward on those requirements; and whether the juror had any concerns or feelings that he or she could not do so. All jurors responded that they could proceed and could put aside any extraneous information. The jury then resumed deliberations and returned with a guilty verdict. Defendant seeks a new trial on the basis that the jury was tainted by extraneous influence.

¶ 20. "[D]efendant is entitled to a fair trial free of the suspicious taint of extraneous influences." *State v. McKeen*, 165 Vt. 469, 472, 685 A.2d 1090, 1093 (1996). The trial judge is in the best position to determine whether a verdict was influenced by extraneous

influences because of the relationship the judge develops with the jury during the course of a trial, and because the determination "is a fact-driven exercise that will depend upon the circumstances of the case." *Id.* at 472, 685 A.2d at 1092 (internal quotations omitted). For these reasons, we accord every reasonable presumption in favor of the trial court's determination, and we will uphold the decision absent a showing of abuse or withholding of discretion. *Id.* at 472, 685 A.2d at 1093. For the reasons that follow, we conclude that the trial court did not abuse its discretion in denying defendant's motion for a new trial.

¶ 21. Not every irregularity in the course of a trial will result in an invalidation of a jury's verdict. To ensure that a defendant is protected from extraneous influences, we have adopted a two-part inquiry. *Id.* "A defendant alleging either extraneous influences or juror misconduct must first demonstrate that an irregularity occurred and it had the capacity to affect the jury's result." *Id.* If the defendant so demonstrates, the State then bears the burden to show "that the irregularity did not in fact prejudice the jurors against defendant." *Id.* at 471, 685 A.2d at 1092. Citing *McKeen* as the appropriate standard, the trial court found no basis for a new trial. The trial court reasoned that the only extraneous information shared with the jury was one juror's interpretation of the law on intent, the court reaffirmed its instructions on that issue, and the panel confirmed, one by one, that they could and would follow only those instructions. The court also observed: "[I]t was clear to the court that the rest of the panel disagreed with the one juror's interpretation of the legal instructions and that is why the written questions came to the court in the first place." The court also found that, given the nature of the allegations in this case, merely learning of the possible penalty would not prejudice Mr. Corcoran against the defendant. Instead, the court noted, it was more likely that the information could prejudice the State because a juror might think the maximum penalty too harsh for the acts alleged. The court found it entirely speculative that a juror would think the penalty too light and "casually convict" in violation of the juror's oath. Further, the court found that the focus of Mr. Corcoran's extraneous research was on the law of intent, not the possible penalty for conviction.

¶ 22. Although the court did not explicitly state its conclusions as to each part of the two-part test for invalidation of a jury verdict, it is apparent from the court's reasoning that it found the extraneous

information did not have the capacity to affect the jury's result because the information concerned only a legal, rather than factual, issue that was duly brought to the attention of the court, and the court reiterated its instructions and obtained an affirmation from all jurors that they would apply only the law given to them in the court's instructions. We agree that on the record presented here the court effectively cured any potential influence that Mr. Corcoran's independent research and opinion of the law may have had on the jury's deliberations.

¶ 23. Finally, we reject defendant's argument that the trial court's curative instructions resulted in the court improperly "interjecting itself into the jury's deliberations." Defendant claims the court directly commented on the "validity" of the extraneous information — as opposed to simply mandating that it be completely ignored — creating the potential of prejudicing the other jurors against anything Mr. Corcoran contributed during the deliberations. Defendant also argues that these additional comments might have caused the jury to disregard defense counsel's closing argument, since Mr. Corcoran said he made the inquiry based on defense counsel's comments about speech. We find this argument unpersuasive. The court expressly stated that it was not commenting on whether the information was correct. The court's comment that it was *possible* that the information relayed may not have been correctly interpreted or recalled was simply an explanation of the importance of the jury following only the court's instructions. We recognize that the court's legal instructions on the elements of the charge may have conflicted with defense counsel's argument to the jury that the alleged acts were insufficient to establish the offense and that the jury should not consider defendant's comments. If the jury chose to disregard any or all of defense counsel's closing argument because it was inconsistent with the court's legal instructions, it was within the jury's province to do so. We find no reason to believe, however, that the jury was potentially prejudiced against defendant by the court's statement that extraneous information about the law cannot be relied upon because the court has not established its accuracy.

*Affirmed.*