2008 VT 128

# State of Vermont v. Kevin Lee

[967 A.2d 1161]

No. 07-334

Present: **Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.**

Opinion Filed October 10, 2008

*Christopher C. Moll,* Lamoille County Deputy State's Attorney, Hyde Park, for Plaintiff-Appellee.

*Matthew F. Valerio,* Defender General, and *Anna Saxman,* Deputy Defender General, Montpelier, for Defendant-Appellant.

¶ 1. **Dooley, J.** After a jury trial in Lamoille District Court, defendant was convicted on a third offense of driving under the influence of alcohol (DUI), giving false information to a police officer, and attempted simple assault. On appeal, defendant argues: (1) the court's decision to play a videotape of defendant invoking his right to silence violated the Fifth Amendment to the Federal Constitution, Article 10 of the Vermont Constitution, and related statutory rights; (2) the court erred in failing to voir dire the jurors to determine if any had seen defendant on a video monitor while he was shackled; (3) the court erred in permitting two police officers to sit in an unused jury box during the trial; (4) the court failed to follow Vermont Rule of Criminal Procedure 24(d) in impaneling the jury; and (5) the court violated defendant's right to testify by not informing him of that right and depriving him of it without an effective waiver. We affirm.

¶ 2. The facts may be briefly summarized as follows. Defendant got into an altercation in the parking lot of Cumberland Farms in Morrisville, Vermont. Police officers arrived at the scene and arrested defendant. At the police department, defendant was placed in a holding cell. Defendant's questioning was videotaped, and a portion of the tape was shown to the jury during the trial.

¶ 3. Defendant was charged with DUI, in violation of 23 V.S.A. § 1201(a)(2), operating with a suspended license, 23 V.S.A. § 674(b), attempted simple assault, 13 V.S.A. § 1023(a)(1), and giving false information to a law enforcement officer, 13 V.S.A. § 1754(a). In addition, the State charged that defendant had been convicted of DUI seven times in the past and sought to have defendant adjudicated a habitual offender, pursuant to 13 V.S.A. § 11.

¶ 4. Prior to trial, the court impaneled a jury of fourteen persons, explicitly deciding not to designate two of them as alternates at that point. The court explained that the two alternates would be selected by lot and dismissed just before the jury retired to deliberate. Defendant did not object to this procedure.

¶ 5. During the morning of the trial's second day, counsel for defendant alerted the court that several jurors might have seen defendant on a television monitor being led into court in shackles.

Defense counsel moved for a new trial because of this incident, and the court denied the motion.

¶ 6. Also during the trial, two plain-clothes officers were sitting in a second jury box, located across the courtroom from the jury box used during the trial and in the direct line of sight of the jurors. Defense counsel argued that the jury would infer that the plain-clothes officers were guarding defendant and conclude that defendant was incarcerated during the trial, a conclusion that would prejudice them against him. He sought a mistrial on this basis; the trial judge denied the motion.

¶ 7. The jury convicted defendant of DUI, attempted simple assault, and giving false information to a police officer. Thereafter, on proof of the former DUI convictions, the jury found that defendant was a habitual offender. Defendant moved for a new trial, and the court denied his motion.

¶ 8. After the verdict, defendant also moved to dismiss his counsel for multiple reasons, including that "[c]ounsel refused [to allow] the defendant to testify on his own behalf." The court never acted on this motion because defendant withdrew it. Defendant never asserted before or during the trial that he was being denied his right to testify. This appeal followed.

¶ 9. Defendant's first argument on appeal is that the court erred in allowing the State to play a videotape of defendant in a holding cell wherein he invokes his rights to speak with an attorney and to not respond to questions posed by a police officer. We note that the parties originally disputed what part of the videotape had been played to the jury. The transcript showed that a part of the marked tape was shown to the jury, but neither the parties nor the court specified what part. The parties have now stipulated to the portion shown to the jury. We request that our civil and criminal rules advisory committees propose a draft rule amendment for criminal and civil cases to provide a clear record for appeal of what the fact-finder has seen and heard if a video or audio recording is submitted as evidence.

¶ 10. We have reviewed the portion of the videotape on which defendant's argument relies.[1] On the video, defendant is in a

---

[1] The tape is very difficult to hear. As we note *infra*, the debate at trial, to the extent there was one, focused on whether the tape showed that defendant was intoxicated and not on the words spoken by defendant or the officer. The record does not show whether the jury would have been able to discern the words spoken.

holding cell while an officer explains his rights to him from a standard-form DUI processing sheet. During this explanation, defendant shouts obscenities at the officer. He stops and remains silent at about the time the officer asks whether defendant has understood the rights that were explained to him. Although the officer asks this question multiple times, defendant does not answer. Nor does defendant answer the question "Do you want to talk to me now?" Defendant argues that his failure to answer the latter question was an invocation of his right to remain silent and that it was an error of constitutional magnitude to show the tape of defendant invoking his right to silence to the jury.

¶ 11. At the outset, we note that this argument was not preserved in the district court. The State introduced the tape to show intoxication, and the court admitted it for that purpose. Defendant did not challenge the admission of the videotape in his new-trial motion. In the absence of preservation, we can reverse the court's decision only if it was plain error. *State v. Oscarson*, 2004 VT 4, ¶ 27, 176 Vt. 176, 845 A.2d 337. "Plain error exists only in exceptional circumstances where a failure to recognize error would result in a miscarriage of justice, or where there is a glaring error so grave and serious that it strikes at the very heart of the defendant's constitutional rights." *State v. Pelican*, 160 Vt. 536, 538, 632 A.2d 24, 26 (1993) (quotation omitted).

¶ 12. We find no plain error in the court's decision to allow the jury to see the video. Defendant relies on *Doyle v. Ohio*, 426 U.S. 610 (1976), and two Texas cases, *Hardie v. State*, 807 S.W.2d 319 (Tex. Crim. App. 1991), and *Fierro v. State*, 969 S.W.2d 51 (Tex. App. 1998), to argue that showing a video of defendant invoking his right to silence was a violation of his constitutional rights and plain error. In *Doyle*, the State used defendant's failure to explain his conduct, following *Miranda* warnings, as evidence that the explanation he gave at trial was invented. The Court held that "it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." *Doyle*, 426 U.S. at 618. Following *Doyle*, we have held that it was error to allow testimony that a defendant asserted his right to silence. *State v. Percy*, 149 Vt. 623, 627, 548 A.2d 408, 410 (1988); *State v. Mosher*, 143 Vt. 197, 205-06, 465 A.2d 261, 265-66 (1983). In *Mosher*, for example, the State solicited an officer's testimony that

after the defendant was given *Miranda* warnings, the defendant did not provide an explanation when confronted with the confession of his friends. During closing arguments, the prosecutor suggested that the defendant should have given the story he gave at trial in response to police questioning. We held this was a violation of the defendant's constitutional rights, because the State used the defendant's silence in an attempt to prove his guilt. 143 Vt. at 206, 465 A.2d at 266.

¶ 13. In *Doyle* and *Mosher*, the prosecution used each defendant's invocation of a right to silence to prove the defendant's guilt and impeach his testimony. *Doyle*, 426 U.S. at 611; *Mosher*, 143 Vt. at 204-06, 465 A.2d at 265-66. The same is true of the Texas cases on which defendant relies. See *Hardie*, 807 S.W.2d at 322 (holding that evidence of the defendant invoking his right to counsel is inadmissible "as evidence of guilt"); *Fierro*, 969 S.W.2d at 54-55 (stating that an audio recording of the defendant invoking his right to counsel and to remain silent is inadmissible as evidence of guilt). In the present case, by contrast, the videotape was introduced to show defendant's behavior as evidence that he was intoxicated. We recognized this distinction in *State v. Voorheis*, where the prosecution allegedly commented on the defendant's right to silence in the following manner: (1) by a police officer testifying that the defendant initiated a conversation with the officer after the defendant had initially indicated he did not want to give a statement; and (2) after defendant testified that a witness blackmailed him into having sex with her, the prosecutor asked whether the testimony was the first time that defendant had told anyone about the blackmail. 2004 VT 10, ¶¶ 17-19, 176 Vt. 265, 844 A.2d 794. We noted that in neither instance was the *prosecution* claiming that defendant's silence showed his guilt, that the prosecution drew no attention to the testimony, and that the trial court stated that it would be surprised if any juror noticed the prosecution's question or its significance. *Id.* ¶ 19. We concluded "these comments are not even remotely similar to the extensive, direct references to defendant's invocation to his right to silence that we have previously held unconstitutional." *Id.* Thus, we found no constitutional violation.[2]

---

[2] We note that courts in other states have found no violation where the state offered evidence of silence for a purpose other than as a direct inference of guilt. See, e.g., *Sampson v. State*, 122 P.3d 1255, 1262 (Nev. 2005) (isolated, unsolicited

¶ 14. If anything, this is a clearer case than *Voorheis.* Assuming that the jury could understand the words spoken on the tape, it is not clear that the jury would have viewed defendant's conduct as an invocation of his right to remain silent as opposed to a pause in his belligerent obscenities. The State did not offer the tape to show defendant was guilty because he refused to speak with the officer; there was no focus at all on the content of what defendant said or did not say. The whole point of showing the tape was to show defendant's behavior. In its closing argument, the State noted only that the jury had "see[n] the video." In the words of *Voorheis,* there was no "extensive, direct reference" to defendant's purported invocation of his *Miranda* rights. We hold, therefore, that there was no error in the court's decision to play the video, and certainly no plain error.

¶ 15. The second issue raised on appeal relates to the alleged viewing on a security monitor of defendant in shackles. Defense counsel saw the incident and told the court that when a juror was at the courthouse security checkpoint, "the T.V. screen went on with [defendant] standing with one of the guards, and the juror looked because it beeped." Defense counsel noted, however, that the security checkpoint guard had made an effort to block the image of defendant that appeared on the screen and that he did not know if the image "was clear to the juror or not." Defense counsel stated that he believed that juror number fourteen was the one who had seen defendant in shackles. In response, the court excused that juror in choosing the twelve jurors who would deliberate.[3] The court did not question juror number fourteen.

¶ 16. Notwithstanding the decision to excuse juror number fourteen, the court took testimony from the checkpoint security

comment from witness that there was no questioning of defendant because he requested an attorney was not intended to "draw a meaning from silence" and not grounds for reversal); *State v. Smallwood,* 561 P.2d 600, 601-03 (Or. 1977) (where defendant did not deny that he stabbed the victim, evidence that he refused to discuss details of offense with a psychiatrist was not reversible because there "was no real likelihood that any adverse inferences were drawn by the jury"); *Teniente v. State,* 2007 WY 165, ¶ 23, 169 P.3d 512 (prosecutor does not comment on the defendant's invocation of his right to silence if he does not use the silence to the state's advantage and argue that it shows guilt, and there is no prejudice to the defendant).

[3] Under the procedure adopted by the trial court, fourteen jurors heard the evidence without designation of which were alternates. Two were to be chosen by lot to be dismissed. The trial court dismissed juror number fourteen although this juror was not selected by lot for dismissal. Other than describing the events and

officer after the jury retired to deliberate. According to the officer, the security monitor usually displays four images simultaneously. When someone enters the back door of the building, the system makes a beeping sound to alert officers watching the monitor, and then the screen switches to a single image from the back door camera. When showing a single image, the officer testified, the screen shows a nine-to-ten inch image of low quality. In this case, the officer testified, the system beeped and shifted to an image of defendant standing with another officer, with that officer taking sixty-five to seventy percent of the image on the screen. The officer testified that he then stepped between the juror going through security and the monitor, and within a second, the monitor shifted back to showing the four images from the four cameras. The officer stated that he believed that it was juror number eight who was going through security when the system beeped, but he could not be sure whether that juror saw the monitor or defendant on it.

¶ 17. This testimony led to a discussion of whether defense counsel could or should testify because his view of what the juror might have seen on the screen differed from the officer's account. Defense counsel moved to withdraw as counsel for defendant because he could not be both a lawyer for defendant and a witness. The court denied this motion. At that point, further consideration of the issue was postponed.

¶ 18. After the jury returned its verdicts, the court mentioned to the jury that one juror was "at the security checkpoint when the television monitor beeped" and inquired whether any of the jurors heard the beep. The court specifically inquired of juror eight. All responded negatively, and all responded negatively when asked if they had discussed what any juror had seen on the monitor. Defense counsel declined the opportunity to ask further questions.

¶ 19. Later that day, the prosecutor sent defense counsel an e-mail, notifying him that the security officer was informed by juror number eight when she left the courthouse that she did, in fact, recall the "monitor incident" but believed that it "didn't mean anything." With this information in hand, defendant moved for a new trial arguing that he had been prejudiced by the court's refusal to allow defense counsel to withdraw and testify, by at

---

claiming that the trial court should have questioned juror fourteen, defendant has not argued that the dismissal of juror number fourteen was error.

least one juror's viewing of the screen, and by the court's failure to question juror number fourteen as to what appeared on the screen.

¶ 20. The trial court denied the motion, ruling that even if there was any inadvertent viewing of defendant, there was no error or prejudice to defendant because: (1) defense counsel could have testified without withdrawing; (2) the court in any event accepted defense counsel's representations, and as a result, excused juror fourteen; (3) the court questioned the jurors who deliberated on whether there had been any discussion of seeing defendant on the monitor, and they indicated there was no discussion; (4) all jurors also indicated they did not see or hear anything; and (5) the court was convinced that if there were any inadvertent viewing of defendant, it had no effect on the jury. In this Court, defendant argues that the trial court made a fundamental error in not immediately questioning the jurors when defense counsel reported the incident.

¶ 21. Relying primarily on the United States Supreme Court's decision in *Deck v. Missouri*, 544 U.S. 622 (2005), defendant argues that a defendant's due process rights are violated if the jury sees him shackled, without adequate justification, during the guilt phase of a trial and that he need not establish actual prejudice in order to make out the violation. In *Deck*, the defendant was convicted of the murder of an elderly couple and sentenced to death. After being granted a new sentencing hearing, defendant appeared in court wearing shackles visible to the jury. After surveying common law and current practice, the Supreme Court held that "the Fifth and Fourteenth Amendments prohibit the use of physical restraints visible to the jury absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial." *Id.* at 629. The rule articulated in *Deck*, and reflected by the Court's earlier decision in *Estelle v. Williams*, 425 U.S. 501 (1976), is supported by two rationales. The first is that "[v]isible shackling undermines the presumption of innocence and the related fairness of the factfinding process." *Deck*, 544 U.S. at 630; accord *Estelle*, 425 U.S. at 511. The second rationale is that "[s]hackles can interfere with the accused's ability to communicate with his lawyer." *Deck*, 544 U.S. at 631 (quotation omitted).

¶ 22. The underlying presumption of defendant's argument is that if one juror briefly sees a defendant in shackles outside of

the courtroom, a mistrial must be called under *Deck*. We disagree. The case law is decidedly to the contrary. See, e.g., *United States v. Jones*, 468 F.3d 704, 709 (10th Cir. 2006) ("In itself, a juror's brief view of a defendant in shackles does not qualify as a due process violation . . . ."); *United States v. Gayles*, 1 F.3d 735, 739 (8th Cir. 1993) (when the juror's view of the shackled defendant is "brief, inadvertent, and outside the courtroom, prejudice to the defendant is slight"); *United States v. Moreno*, 933 F.2d 362, 368 (6th Cir. 1991) (exposure of a jury to a defendant in shackles requires a mistrial only when the exposure is so inherently prejudicial to deny a fair trial; defendant must show actual prejudice where exposure was during routine security measures outside the courtroom); *Ritchie v. State*, 875 N.E.2d 706, 718 (Ind. 2007) (*Deck* and its predecessors apply only to visible shackles during a courtroom proceeding; video of defendant being questioned while in jail clothing and shackles raises only "minuscule" risk of diluting the presumption of innocence or of guilt being established by an "extraneous influential factor"); *State v. Nields*, 752 N.E.2d 859, 890 (Ohio 2001) (same as *Gayles*). Indeed, given the limited ability to separate trial participants in many of our rural courthouses, it is likely that such exposure is not infrequent. Cf. *Davis v. Commonwealth*, 899 S.W.2d 487, 491 (Ky. 1995) (noting that it was impossible to conduct a trial without the jury seeing "that the defendants are not entirely free to come and go as they please" in case where defendant entered the courtroom in handcuffs which were then removed (quotation omitted)), *overruled on other grounds by Merriweather v. Commonwealth*, 99 S.W.3d 448 (Ky. 2003).

■ ■ ¶ 23. This issue must be viewed in light of our settled law on extraneous influences on the jury. See *State v. Squires*, 2006 VT 26, ¶¶ 20-23, 179 Vt. 388, 896 A.2d 80; *State v. Gorbea*, 169 Vt. 57, 60-61, 726 A.2d 68, 70 (1999); *State v. McKeen*, 165 Vt. 469, 472-76, 685 A.2d 1090, 1092-94 (1996). We have adopted a two-part initial inquiry: (1) whether the irregularity occurred; and (2) whether the irregularity had the capacity to affect the jury's verdict. *Gorbea*, 169 Vt. at 60, 726 A.2d at 70. If defendant demonstrates these two elements, the burden shifts to the State to show the absence of prejudice. *Squires*, 2006 VT 26, ¶ 21. Because the trial judge develops a relationship with the jury, we view the trial judge to be in the best position to determine whether there was improper influence on the jury's verdict. *Id.*

¶ 20. Thus, we accord the judge discretion and reverse only for abuse of that discretion. *Id.* We believe that this discretion must extend to the procedure the court adopts to determine whether there has been an improper influence as well as to the substance of the determination.

¶ 24. We see no abuse of discretion in the procedure the court adopted in this case. While the court could have questioned the jurors immediately, that course of action might have had the effect of unnecessarily highlighting the issue where defendant made no showing of special prejudice and the likelihood of unfair prejudice was small. The court eventually removed the juror defense counsel identified as having seen the security monitor and questioned the remaining jurors so as to satisfy itself that the incident had no improper extraneous influence on the jury verdict. We affirm that determination.

¶ 25. Defendant's next argument is that the trial court "erroneously permitted two police officers to sit in the jury box" and that these officers had "an extraneous influence on the jury." On the second day of trial, defense counsel brought to the court's attention that the jurors had asked a court employee who the two men sitting in the courtroom were, and the employee answered that he did not know. In defense counsel's view, this way of answering the jurors' question "would lead the jury to conclude [that the men] must be . . . from corrections or something of that nature." Defense counsel argued that the jurors would assume that they were plain-clothes police officers and that the officers' presence raised a presumption that defendant was incarcerated and undermined the presumption of defendant's innocence. Defendant then moved for a mistrial. After a hearing in which a court officer testified to the conversation with the jurors, the court denied the motion.

¶ 26. As discussed *supra*, ¶ 23, there is a two-step process to determine whether an extraneous influence is present, by inquiring (1) whether an irregularity occurred, and (2) whether the irregularity had the capacity to affect the jury's verdict. *Gorbea*, 169 Vt. at 60, 726 A.2d at 70. If defendant establishes these two elements, the burden shifts to the State to show the absence of prejudice. *Squires*, 2006 VT 26, ¶ 21. We accord the trial judge discretion and reverse only for abuse of that discretion. *Id.* ¶ 20. Similarly, we will not reverse the court's denial of a motion for

mistrial unless the court abused its discretion or withheld its discretion altogether. *State v. Desautels*, 2006 VT 84, ¶ 18, 180 Vt. 189, 908 A.2d 463.

¶ 27. A presumption of innocence in favor of the accused is a basic element of a fair trial in our system of justice. *Estelle*, 425 U.S. at 503. Like shackling, having the defendant appear continuously before the jury in prison garb undermines that presumption. *Id.* at 504-05. A brief reference to a defendant's incarceration is not enough, however, to undermine the presumption and cause a mistrial. See *United States v. Villabona-Garnica*, 63 F.3d 1051, 1058 (11th Cir. 1995); *United States v. Barcenas*, 498 F.2d 1110, 1113 (5th Cir. 1974).

¶ 28. Here, there is nothing beyond speculation to show that the jury knew that defendant was incarcerated. Court security is now ubiquitous, and its presence does not necessarily show that defendant is incarcerated. Similarly, it is mere speculation that the jury was influenced by the response of the court officer. In such circumstances, we cannot find that the court abused its discretion in not declaring a mistrial. See, e.g., *United States v. Blasingame*, 219 F. App'x 934, 947 (11th Cir. 2007) (no error where comment of the court "required the jury to make several inferential steps to conclude that defendant was in custody"); *State v. Drayton*, 175 P.3d 861, 869 (Kan. 2008); *State v. Freiburger*, 620 S.E.2d 737, 742 (S.C. 2005).

¶ 29. Defendant's next argument is that the court erred, under Vermont Rule of Criminal Procedure 24, in not designating two jurors as alternates at the beginning of the trial. The court selected fourteen jurors at the jury draw before trial, explaining that the court typically chooses "more jurors than will actually decide the case" in cases like this one, involving "a multi-day trial" that was "not going to get started for three weeks." None were designated as alternates. Defense counsel did not object to this procedure or raise the issue in any post-verdict motion. Because defendant did not preserve this argument, we review the trial court's decision only for plain error.

¶ 30. Rule 24(d) provides in pertinent part:

> The court may direct that not more than four jurors in addition to the regular jury be called and impanelled to sit as alternate jurors. Alternate jurors in the order in

which they are called shall replace jurors who, prior to the time the jury retires to consider its verdict, become or are found to be unable or disqualified to perform their duties. Alternate jurors shall be drawn in the same manner, shall have the same qualifications, shall be subject to the same examination and challenges, shall take the same oath, and shall have the same functions, powers, facilities, and privileges as the regular jurors. An alternate juror who does not replace a regular juror shall be discharged after the jury retires to consider its verdict.

V.R.Cr.P. 24(d). Here, the court did not designate alternates until just before the jury retired to deliberate. The federal courts have interpreted the equivalent federal rule[4] to require immediate designation of the alternate jurors. See *United States v. Brewer*, 199 F.3d 1283, 1286-87 (11th Cir. 2000); *United States v. Love*, 134 F.3d 595, 601 (4th Cir. 1998). As the Sixth Circuit explained, the federal rule "assumes that alternate jurors will be designated separately — and sequentially — *before the trial begins*." *United States v. Delgado*, 350 F.3d 520, 525 (6th Cir. 2003) (emphasis added). The federal rule does not authorize the procedure employed here. See *United States v. Mendoza*, 510 F.3d 749, 753 (7th Cir. 2007); *Delgado*, 350 F.3d at 525.

¶ 31. We recognize that there are benefits from the procedure adopted by the trial court. As the court in *Mendoza* noted:

[A]ll 16 tentative jurors may be more likely to devote their full attention to the evidence presented given the likelihood that they will not be selected as an alternate. If an alternate replaces a juror during deliberations, the collective knowledge of the newly constituted jury would be likely to suffer.

510 F.3d at 753. The only significant risk of prejudice involves defendant's ability to use peremptory challenges against jurors who have the greatest likelihood of serving. Thus, the federal decisions have generally held that error in failing to designate

---

[4] The relevant portion of Rule 24(d) is virtually identical to Federal Rule of Criminal Procedure 24(c) as it existed before amendment in 2002.

alternates under Federal Rule 24(c) is harmless unless defendant can show specific prejudice. See *id.* at 754; *Delgado,* 350 F.3d at 526. These rulings are consistent with our decision in *State v. Lambert,* 2003 VT 28, 175 Vt. 275, 830 A.2d 9, in which the court dismissed a juror on the State's request, after the jury was impaneled, and defendant argued that the dismissal was improper. We held that any error was harmless because defendant has no right to any specific juror. *Id.* ¶ 10. We recognized that the result could be different if the State, in effect, gained an extra peremptory challenge from the dismissal for cause. *Id.* ¶ 11. We follow the federal decisions and require defendant to show prejudice before the error of failing to designate alternate jurors can be considered reversible error.

 ¶ 32. To the extent defendant suffered any harm on the basis of the Rule 24 violation, that harm related to defendant's use of peremptory challenges. Rule 24(d) provides for additional peremptory challenges for the parties to use specifically against potential alternates: one peremptory challenge whenever one or two alternates are impaneled, and two additional peremptory challenges whenever more than two alternates are impaneled. V.R.Cr.P. 24(d); cf. *Mendoza,* 510 F.3d at 753 (similar practice by trial court rendered defendant "unable to exercise peremptory challenges specifically against alternate jurors"). The additional peremptory challenge or challenges can be used only against an alternate. V.R.Cr.P. 24(d). Here, the court gave each side seven peremptory challenges, one more than the normal six, V.R.Cr.P. 24(c)(3), to reflect the presence of the two additional jurors. Defendant used all his peremptory challenges, and the State did not. We can only speculate whether defendant came out ahead or behind in relation to the procedure specified in the rule. On the one hand, defendant gained an unrestricted peremptory challenge. On the other hand, defendant may have exercised a peremptory challenge with respect to a juror who would have been dismissed by lot at the end of the evidence. Defendant has not argued that his right to peremptory challenges was impaired or that there was an additional juror that he wanted to challenge. The procedure did not give an extra unrestricted peremptory challenge to the State because it did not use all its peremptory challenges. Under the

circumstances, the procedure was harmless, and thus, there was no error. Since it was not error, it was not plain error.[5]

¶ 33. In his final argument, defendant asks this Court to overrule our decision in *In re Mecier*.[6] 143 Vt. 23, 460 A.2d 472 (1983). In *Mecier*, we held that a defendant waives his right to testify when he acquiesces to the advice of his attorney not to testify on his own behalf or fails to assert the right to testify at or before trial. *Id.* at 28, 460 A.2d at 475. Defendant argues that we should find that waiver will not be presumed from a silent record. Defendant puts forward three reasons for us to overrule *Mecier*: (1) *Mecier* was decided before the constitutional underpinnings of the right to testify were fully developed in *Rock v. Arkansas*, 483 U.S. 44 (1987), and *State v. Brunelle*, 148 Vt. 347, 534 A.2d 198 (1987); (2) a number of circuit and state courts decided, after *Rock*, to require a record colloquy with defendant personally; and (3) this Court requires a record colloquy for the waiver of other rights. We address each argument in turn.

¶ 34. Defendant first argues that the subsequent ruling by the United States Supreme Court in *Rock v. Arkansas* and our ruling in *State v. Brunelle* cast doubt on our analysis of a defendant's right to testify on his own behalf under the United States and Vermont Constitutions in *Mecier*. The United States Supreme Court stated in *Rock* that a defendant's right to testify on her own behalf is a fundamental constitutional right. 483 U.S. at 53 n.10. We held in *Brunelle* that Chapter I, Article 10 of the Vermont Constitution "explicitly includes the right to testify on one's own behalf." 148 Vt. at 352, 534 A.2d at 202. Defendant argues that because the right to testify on one's own behalf is a fundamental constitutional right, waiver of this right should not be

---

[5] The asserted error in this argument is different from that with respect to juror number fourteen, the juror whom the defense counsel identified as having seen the image of defendant in shackles on the monitor. In essence, the court dismissed that juror for cause, in variance from the plan to dismiss two jurors chosen by lot. As we held in *Lambert*, however, any error in this action is harmless as a matter of law. 2003 VT 28, ¶ 10.

[6] We acknowledge that defendant argued at oral argument that he did preserve the issue of his right to testify through his withdrawn motion to dismiss defense counsel. However, defendant never argued, in his brief or otherwise, that he properly invoked and was denied his right to testify under *Mecier*. Consequently, we have not addressed the argument that defendant invoked but was denied his right to testify.

allowed without a personal waiver by defendant based on a colloquy on the record.

¶ 35. In *Mecier*, we required defendants to assert their right to testify in their own defense. 143 Vt. at 28, 460 A.2d at 475 ("[T]he right [to testify] is subject to the limitation that the defendant make his objection known at trial, not as an afterthought." (quotation omitted)). *Rock* does not require a different result. *Rock* overturned Arkansas's per se rule that a defendant could not testify regarding memories recovered under hypnosis because the rule violated the defendant's right to testify. 483 U.S. at 62. The defendant in *Rock* asserted her right to testify, but was not allowed to do so. Here, defendant failed to assert his right to testify. Because defendant did not assert his right to testify on his own behalf as required by *Mecier*, he cannot now claim that this was a violation of his constitutional right under *Rock*. The United States Supreme Court in *Rock* recognized that a defendant's right to testify is not without limitation and "must comply with established rules of procedure and evidence." *Id.* at 56 n.11 (quotation omitted).

¶ 36. Nor is *Brunelle* any help to defendant. That case involved the right to testify without being impeached by unconstitutionally obtained evidence. In this context, we held that Chapter I, Article 10 of the Vermont Constitution gives a defendant greater rights than do analogous provisions of the Federal Constitution. Compare *United States v. Havens*, 446 U.S. 620, 627-28 (1980) (unconstitutionally obtained evidence can be used to impeach testimony given for the first time on cross-examination), with *Brunelle*, 148 Vt. at 353, 534 A.2d at 203 (suppressed unconstitutionally obtained evidence can be used to impeach only testimony directly contradictory to that suppressed). We based our decision in *Brunelle* on the chilling effect that the State's use of unconstitutionally obtained evidence could have on a defendant's decision to testify. 148 Vt. at 353, 534 A.2d at 203. In the present case, defendant made no effort to assert his right to testify before or during trial. Like the defendant in *Rock*, and unlike defendant here, the defendant in *Brunelle* asserted his right to testify but decided not to do so when the trial court ruled the State could use unconstitutionally obtained evidence to impeach him on cross-examination. *Id.* at 348, 534 A.2d at 199-200. Because defendant did not assert his right to testify on his own behalf, he cannot

now claim that this was a violation of his right to testify under the Vermont Constitution.

¶ 37. Finally, on this point, we note that we reaffirmed the holding of *Mecier*, after the decisions in *Rock* and *Brunelle*, in *State v. Mumley*, 153 Vt. 304, 305, 571 A.2d 44, 44-45 (1989). Citing *Brunelle*, we recognized in *Mumley* that the right to testify in one's own defense is a constitutional right under both the Federal and Vermont Constitutions. *Id.* Moreover, *Mumley* is more than a decision following *Mecier* as a matter of stare decisis. As noted below, it analyzes again the policy behind the decision and endorses it. See *id.* at 306, 571 A.2d at 45.

¶ 38. Defendant next argues that we should follow the circuit and state courts that decided, after *Rock*, to require a personal waiver of the right to testify through a colloquy on the record. Defendant cites numerous courts that now require a personal waiver, including four circuit courts. The requirement of a record colloquy, however, is not the majority rule. See *Brown v. Artuz*, 124 F.3d 73, 78-79 (2d Cir. 1997) (collecting cases); 6 W. LaFave et al., Criminal Procedure § 24.5(d), at 437-38 (3d ed. 2007). We discern no clear consensus or trend in the decisions of the state and federal courts, and find nothing in the authorities cited by defendant that undermines our holding in *Mecier*. Thus, we are not persuaded that the decisions after *Mecier*, even those that reached a different result, are grounds to overturn that decision. See *State v. Berini*, 167 Vt. 565, 566, 701 A.2d 1055, 1056 (1997) (mem.) ("While not slavish adherents to stare decisis, we generally require more than mere disagreement to overturn a decision . . . ." (citation omitted)).

¶ 39. Finally, defendant claims that this Court requires a record colloquy for the waiver of other rights, and that the right to testify should be treated in the same fashion. Defendant correctly notes that we require a personal waiver based on a record colloquy for a defendant to waive the right to counsel, *State v. Pollard*, 163 Vt. 199, 206-07, 657 A.2d 185, 190-91 (1995), or the insanity defense, *State v. Brown*, 2005 VT 104, ¶ 39, 179 Vt. 22, 890 A.2d 79. This Court examined a similar argument in *Mumley*. 153 Vt. at 305-06, 571 A.2d at 45. In *Mumley*, we distinguished the waiver of the right to testify from the waiver of the right to counsel. "In right-to-counsel cases, the [trial] court is obligated to make special efforts to determine the validity of the defendant's

waiver precisely because the defendant has no counsel." *Id.* at 306, 571 A.2d at 45. Similar logic applies to the requirement of a record colloquy for the waiver of the insanity defense. A record colloquy is required because there is a public interest in protecting "an insane person from being held culpable for his actions." *Brown*, 2005 VT 104, ¶ 36 (quotation omitted). In addition, there is a fear that a potentially insane defendant may be unable to make a rationale decision, particularly where the defendant has little bargaining power. *Id.* ¶ 38.

¶ 40. These factors are not present in this case. Defendant was adequately represented by counsel. "Where the defendant *has* competent counsel, the court need be less solicitous; counsel herself may be expected to advise the defendant of the benefits and drawbacks of various trial strategies." *Mumley*, 153 Vt. at 306, 571 A.2d at 45. As the Court of Appeals for the Second Circuit has concluded, effective counsel includes the duty to inform the defendant of the right to testify. *Artuz*, 124 F.3d at 79.

¶ 41. We are concerned about the effect of interfering in the attorney-client relationship with respect to this issue. In deciding not to require a record colloquy for the waiver of the right to testify, the New Jersey Supreme Court reasoned that the right to testify is counterpoised by the right not to testify, and requiring the trial judge to conduct a record colloquy might be an inappropriate intrusion on a tactical decision more appropriately made by the client and the attorney. *State v. Savage*, 577 A.2d 455, 472-73 (N.J. 1990). We agree that the decision whether to testify is best made by the defendant with the advice and assistance of counsel. See *Artuz*, 124 F.3d at 79.

¶ 42. In this case, defendant failed to reveal his desire to testify either before or at trial. He finally raised the issue in his motion to dismiss counsel, but that came well after the jury returned a verdict of guilty. Having failed to assert the right in a timely fashion, he has waived it. See *Mumley*, 153 Vt. at 305, 571 A.2d at 45; *Mecier*, 143 Vt. at 28, 460 A.2d at 475. He cannot now claim that his right to testify has been infringed.

*Affirmed.*